Peter MANOS, Administrator of the Estate of Mike Manos, deceased, Plaintiff,

v.

TRANS WORLD AIRLINES, INC., a corporation, and Boeing Company, a corporation, Defendants.

Walter A. SCHANKE, as the Heir at Law and Next of Kin of Ellen C. Schanke, Philip Schanke, Elaine M. Schanke and Paul Eugene Schanke, and Walter A. Schanke, as Administrator of the Estates of Ellen C. Schanke, Philip Schanke, Elaine M. Schanke and Paul Eugene Schanke, Plaintiff,

v.

BOEING COMPANY, a corporation, Defendant.

Loretta GARTLEY, Plaintiff,

v.

BOEING COMPANY, a corporation, Defendant.

Elizabeth NESSLER, as Administrator of the Estates of Keith Burruss Trotter, Deceased, Patricia Faye Trotter, Deceased, Bonnie Lou Trotter, Deceased, Janet Ann Trotter, Deceased, and Keith Burruss Trotter, Jr., Deceased, Plaintiff,

v.

BOEING COMPANY, a corporation, Defendant.

Bryan R. McCARTHY, as Administrator of the Estate of Eleanor W. Flegal, Deceased, and Bryan R. McCarthy, as Executor of the Estate of Dorothy A. Flegal, Deceased, Plaintiff,

v.

BOEING COMPANY, a corporation, Defendant.

Gwendolyn HEURTEVANT, as Widow of Francis Michael Heurtevant, Deceased, Michael Heurtevant, a minor, by Gwendolyn Heurtevant, his mother and next friend, Marc Heurtevant, a minor, by Gwendolyn Heurtevant, his mother and next friend, and James Otis as Administrator of the Estate of Francis Michael Heurtevant, Deceased, Plaintiffs,

v.

BOEING COMPANY, a corporation, Defendant.

Joseph SAINTON, Plaintiff,

v.

BOEING COMPANY, a corporation, Defendant.

Edward PFEFFER, as Administrator of the Estate of Edward C. Daly, Plaintiff,

v.

BOEING COMPANY, a corporation, Defendant.

Paul W. HANS, as Administrator of the Estate of Joseph J. Sondag, Plaintiff,

v.

BOEING COMPANY, a corporation, Defendant.

John TSAMANIS for the use and benefit of Emmanuel I. Tsamanis, Daphne Tsamanis, John Tsamanis, Sophia Papagaorgiou and Elizabeth Angelinaras, the heirs-at-law and next of kin of Peter Tsamanis, Deceased, Plaintiffs,

v.

BOEING COMPANY, a corporation, Defendant.

Nathan GRANSTEIN, as Executor of the Estate of Georgette Granstein, Deceased, Plaintiff,

v.

The BOEING COMPANY and Alitalia Airlines, Inc., Defendants.

John M. XIFARAS, Administrator of the Estate of Irene Sakellarios, Plaintiff,

v.

BOEING COMPANY, a corporation, Defendant.

Nos. 65 C 1932, 66 C 1586–66 C 1589, 66 C 2135–66 C 2139, 67 C 1144 and 67 C 1147.

United States District Court, N. D. Illinois, E. D.

Jan. 11, 1971.

Motion to Amend March 11, 1971.

Lieberman, Levy & Baron, Chicago, Ill., for plaintiff in each case.

L. R. Voigts and John J. McLaughlin, Parrish, Guthrie, Colfelsh & O'Brien, Des Moines, Iowa, for plaintiffs Edward Pfeffer and Paul W. Hans.

Michael K. Stanton, New York City, for plaintiff Nathan Granstein.

Nicholas P. Christy, New York City, for plaintiff, John M. Kifaras.

Heineke, Schrader, Marsch & Cuncannan, Chicago, Ill., Mendes & Mount, Matthew J. Corrigan and Randolph O. Petgrave, New York City, for defendant in each case.

Donald P. Reel, Atlantic, Iowa, for defendant, Boeing Co.

## DECISION ON THE MERITS

ROBSON, Chief Judge.

These twelve cases were brought against Trans World Airlines (TWA) and The Boeing Company (Boeing) for damages suffered by certain passengers of a Boeing aircraft owned and operated by TWA, which exploded and burned after striking a piece of construction equipment during an aborted take off at Leonardo da Vinci Airport near Rome, Italy, on November 23, 1964. TWA is no longer a party to the action, and the court has consolidated the twelve cases for trial on the sole issue of Boeing's liability. Plaintiffs and Boeing having waived a jury trial, a bench trial was held on this issue.

The Fourth Amended Complaint, which is directed solely to the issue of liability for purposes of the trial, contains three counts. Count I charges that the thrust reverser system of the aircraft in question was defective and unsafe in violation of express and implied warranties of Boeing, the manufacturer. The court has previously held that the law of the State of Washington, the place of delivery of the aircraft to TWA, governs this issue. Manos v. TWA, 295 F.Supp. 1170, 1176 (N.D.Ill. 1969).

Count II charges that Boeing was negligent in several respects in the design and manufacture of the thrust reverser system. The court has held that the law of Italy, the place of the

tort, governs this issue. Manos v. TWA, *supra*, at 1173.

Count III alleges gross negligence and seeks punitive damages. The court will reserve ruling on this count for consideration with other damage issues.

Boeing's motions, made both during and after trial, to strike and dismiss Counts I and II and to dismiss the entire cause on the ground that plaintiffs have shown no right to relief, have been taken with the case for ruling. Certain evidentiary objections, aside from lack of foundation, have also been reserved for ruling at this time.

Having considered the trial testimony and the briefs, together with all the relevant documentary evidence and depositions, the court is of the opinion that judgment should be rendered for the plaintiffs.

## I. EVIDENTIARY RULINGS

■ Boeing has first objected to documents of Boeing, TWA, and the Federal Aviation Administration (FAA) which contain, in whole or in part, evidence of post-accident modifications or changes on the ground that they are irrelevant. (Exhibits 13, 86, 88, 89, 91, 92, 96, 124, 128, 87, 90, 93, 101, 127, 129 77A–D, 78, 79, 83, 84, 157–60, 176, 177, 177A, 178, 178A, 179, 185, 186, 284, 291, 292, 118, 188, 189, 192.) Plaintiffs state that all post-accident evidence is offered solely for the purpose of showing the feasibility of changes and not as proof of negligence. The court, sitting without a jury, will overrule Boeing's objections and admit the documents on this basis. *See* Boeing Airplane Co. v. Brown, 291 F.2d 310, 315 (9th Cir. 1961); Brown v. Quick Mix Co., Division of Koehring Co., 75 Wash.2d 833, 454 P.2d 205 (1969).

■ Boeing has also objected to Exhibits 76A–D, 78, 80K, 80K1, 153, 154, 168, 191, and 256 on grounds that they evidence post-delivery technological improvements irrelevant to the negligence issue. Plaintiffs offer the documents, which pre-date the accident, as proof of Boeing's knowledge of the defects in its fittings. On this basis, the court will admit the documents and overrule Boeing's objections. *Cf.* Braniff Airways, Inc. v. Curtiss-Wright Corp., 411 F.2d 451, 453 (2nd Cir. 1969).

■ Boeing finally objects to Exhibits 118, 184, 188, and 189 on the grounds that they are Boeing intra-company memoranda, which do not speak for the company. It is clear to the court that these are carefully prepared engineering reports which are admissible as business records of Boeing under 28 U.S.C. § 1732, and the objections are therefore overruled.

Plaintiffs object to several TWA documents—Exhibits 34, 39, 114, AB, AF–AN, BZ, 15, and AE—on hearsay grounds. Exhibits 34, 39, 114, AB, AF–AN, BZ, and 15 will be admitted as declarations against interest by TWA as well as Exhibit 17 offered by plaintiff in response. Exhibit A is clearly hearsay and will not be admitted. In light of this ruling, Exhibits 22–25 will be considered withdrawn by plaintiffs.

■ Plaintiffs object to all FAA certification and testing documents—Exhibits W, CE, CF, CG1, CG2, CL, CM, CN, CP, and CX—on relevancy grounds. The objection to these documents goes primarily to their weight, and the court, sitting without a jury, will admit them into evidence.

Plaintiffs object to Boeing documents, Exhibits 193, 194, and 297, on the grounds that they are self-serving hearsay opinions of Boeing. The documents are business records under 28 U.S.C. § 1732, and the objections go primarily to the weight of the evidence. The court will therefore admit them into evidence and overrule the objections.

■ Plaintiffs have lastly objected to Exhibit DJ, a letter from the FAA to the Civil Aeronautics Board (CAB). It is admissible under 28 U.S.C. § 1733, and plaintiffs' objection is overruled.

Boeing's objection to Exhibit 125 for lack of foundation has been withdrawn,

and this document is therefore admitted into evidence.

## II. FINDINGS OF FACT

### A. *The Occurrence*

1. On November 23, 1964, at approximately 1300 Greenwich Mean Time (2:00 P.M. local time), a BOEING 707/331 four engine commercial jet transport, owned and operated by TWA and carrying the markings N769TW, was departing from the Leonardo da Vinci Airport, near Rome, Italy, on TWA's regularly scheduled Flight No. 800/22 destined for Cairo, Egypt, with an intermediate stop at Athens, Greece. (Final Pretrial Order, pp. 4–5.)

2. Aircraft N769TW had been designed and manufactured by Boeing and delivered to TWA on May 9, 1960, in Renton, Washington. (Final Pretrial Order, p. 4.) The engines were Pratt and Whitney JT–4 engines, the thrust of which had been increased by TWA since delivery within Boeing stated design limits. (Exhibits C4, DS, DV; Morelli Dep. 73.)

3. The aircraft was designed and manufactured in conformity with a Type Certificate issued by the FAA on July 15, 1959, and the engines in conformity with a Type Certificate issued by the FAA on March 15, 1957. (Exhibits CX, CN; Neuhart Dep. 33; Fisher Dep. 151.)

4. Certificate of Air Worthiness AC–358 was issued the N769TW by the FAA on May 10, 1960. (Final Pretrial Order, p. 5; Exhibit W.)

5. At the time of the takeoff, the weather was fair and clear. The aircraft was taking off from east to west on a compass heading of approximately 250°. The wind at the time was from 230° at 3 knots, the temperature was 64° F., the altimeter setting was 1023 millibars, the runway was dry and the weight of the aircraft was 214,393 pounds. (Exhibits CD, OP. 3; 40.)

6. Runway 25 was normally 8,612 feet long, but due to construction work in progress near its west end, as the crew had been informed, its legal length had been reduced to 6,562 feet, which was sufficient for the takeoff under the conditions stated. (Final Pretrial Order, p. 5; Lowell Dep. p. 117.)

7. At the time of the takeoff, the aircraft was under the command of Captain Vernon W. Lowell who was sitting in the forward left-hand seat of the cockpit. He piloted the aircraft along the taxiways from the TWA boarding gate and onto Runway 25 "at a couple of miles per hour" until just prior to the application of takeoff power. (Lowell Dep. 33, 44.) A rolling type takeoff was initiated with First Officer William A. Slaughter who was sitting in the forward right-hand seat at the controls. (Lowell Dep. 41, 45.) This procedure is common and is a recognized and acceptable practice for takeoffs. (Adkins T. 809, 862.)

8. The $V_1$ speed, that is the maximum air speed at which the takeoff could be safely aborted without taking into account the use of reverse thrust, was 124 knots. (Exhibits CD, OP. 2; Frier Dep. 73; King T. 553; Lowell Dep. 41–43.)

9. During the takeoff run, Captain Lowell operated the nose wheel steering and called out the speed of 80 knots when the aircraft reached that speed. At that approximate time, the Flight Engineer called out and at the same moment Captain Lowell observed that the No. 4 engine EPR (engine pressure ratio) gauge had dropped off to a point of near zero reading. A few seconds after this, the No. 2 engine thrust reverser indicator warning light came on. (Lowell Dep. 45, 48; Exhibits CD, OP. 4–5.)

10. Captain Lowell decided to abort the takeoff after the appearance of these two abnormal indications involving two separate engines. Shortly after the appearance of the No. 2 thrust reverser warning light, Captain Lowell took over the controls of the aircraft from First Officer Slaughter and initiated the abort maneuver. One of the procedures followed by Captain Lowell in aborting the takeoff was the use of reverse

thrust. (Lowell Dep. 49, 52–53, 203–04; Exhibit CD, OP. 4–5.)

11. Captain Lowell made the decision to abort the takeoff and commenced the abort at a speed below the $V_1$ speed of 124 knots, and the decision to abort in light of threatened engine failure was thus proper under all the circumstances. (LeClaire Dep. 76–80; Lowell Dep. 70; Exhibits 295, 296, V, 205, P3; CD, OP. 5.)

12. During the abort, Captain Lowell saw heavy equipment operating on both sides of the runway and across it beyond its legal length. (Lowell Dep. 80.)

13. A road roller was about 150 feet to the right of the centerline of the runway proper at approximately the 7,530-foot point. Barber-Greene machinery was on the runway, about 86 feet to the left of the centerline at approximately the same distance. (Exhibit 204; Schepisi Dep. 167–69.)

14. Shortly after Captain Lowell commenced the abort maneuver, the aircraft began to yaw to the right. He attempted to counteract this right-hand yaw by the use of differential braking. In using differential braking Lowell applied heavy braking on his left tires and light or no braking on his right tires. (Lowell Dep. 71–74; Wall T. 323–24; Exhibits C–P, CV, 204, 205, p. 3.)

15. After the aircraft yawed to the right, it first veered toward the right-hand edge of the runway, then followed a path approximately parallel to the right-hand edge of the runway, and then veered to the right a second time. During this second veering of the aircraft to the right, the No. 4 engine which was the right-hand outboard engine, struck the road roller which was 20.5 feet to the north or off the right-hand edge of the runway and approximately 1,000 feet beyond the designated legal end of the runway. The path followed by the aircraft during the abort was as shown in Exhibit 204. (Lowell Dep. 72–74; Wall T. 328–31; Exhibits 204, 307, C–P, CV.)

16. As a result of the collision with the road roller, a large section of the No. 4 engine was knocked to the pavement and fuel being pumped out from a ruptured fuel line ignited and caused a fire. (Exhibits 17(4); CD, OP. 5.)

17. After the impact with the road roller, the aircraft continued to travel forward without further yawing or slippage to the right and stopped about 850 feet from the point where it had collided with the road roller. After the aircraft came to a stop, there were a series of explosions in the aircraft's fuel tanks, which caused the destruction of the aircraft and the deaths and injuries involved in this suit. (Lowell Dep. 90–91; Exhibits 204; CD, OP. 5–6.)

## B. Subsequent Investigations

18. The physical evidence (*i. e.*, tire marks) left by the plane on its course down the runway, (Exhibits C–P, CV, 5–12) the subsequent flight recorder readout by the Civil Aeronautics Board (Exhibit CW), and a study of that readout by Boeing and TWA (Exhibit BW) indicate that the aircraft made several heading changes during the abort. The first major yaw of the aircraft was to the right. This occurred at 4250 feet down the runway and continued until 5900 feet when the airplane then yawed to the left until the 6500-foot point. At the same time that the plane was yawing to the left from the 5900-foot point to the 6500-foot point, it was side slipping toward the right-hand edge of the runway. At approximately the designated legal end of the runway about the 6500-foot point, the aircraft yawed to the right a second time and then veered further toward the right-hand edge of the runway. (Exhibits 307, 204; Kovitz T. 131, 136, 138; Schepisi Dep. 24–26.)

19. The tire marks on the runway also indicate that from the location where Captain Lowell first commenced using differential braking until shortly before the aircraft struck the road roller, Captain Lowell used heavy left-hand differential braking almost continuously in an effort to bring the aircraft back to the center of the runway. (Exhibits 5–

12, C–P, CV; Lowell Dep. 71–75; Kovitz T. 141, Wall T. 323–24.)

20. The flight recorder readout and analysis indicate that the maximum speed attained by the aircraft was 131 knots at about the 4250-foot point, and that the speed of the airplane did not noticeably decrease until about the 5300-foot point. (Exhibit BI.)

21. The first physical evidence of any effort to decelerate the airplane through the use of wheel brakes was at about the 4500-foot point on the runway. (Exhibits CD, OP. 8; BI, BB.)

22. After the accident, the remains of the No. 4 engine and the EPR gauge were checked. No fault was found to account for the gauge having dropped to zero. (Plaintiffs' Admission 34.)

23. It was found after the accident that the thrust reverse switch for the No. 2 engine had been marginally rigged by TWA at the last overhaul of the engine: it had been set to activate the light in $\frac{1}{16}''$ distance compared to the $\frac{3}{8}''$ distance specified in the Boeing drawing. (Wood T. 1053, Schepisi Dep. 42; Plaintiffs' Admission 35.)

24. It was further found after the accident that the B-nut fastening the pneumatic air supply line for the No. 2 engine thrust reverser at the ground air shuttle valve had backed off and that the pneumatic air supply line for the No. 2 engine had separated from the ground air shuttle valve. Fire markings revealed that it had been so separated before fire reached it. (Final Pretrial Order, p. 6.)

25. The end of the particular tube assembly found separated consisted of a tube with a preset sleeve over which a B-nut was fastened to connect the tube to the shuttle valve. (Exhibit CC.) The sleeve on the end of the tube that had separated was later found to be out of round as shown by elliptical scoring marks on the tube. (Exhibits CC, 273, 279; van der Velder T. 1232–33.)

26. No other discrepancies in the thrust control linkage of the No. 2 engine, and no failure of its interlock system were discovered. (Exhibit DH; Morelli Dep. 88.)

## C. *The Thrust Reverser System*

27. The aircraft and engines of N769TW were manufactured and assembled to plans and specifications of the Boeing Company providing for the use of a reverse thrust system which Boeing states was available for use when the airplane was to be decelerated during ground operations. Boeing specified in the Operations Manual which it furnished to TWA for the model 707/331 aircraft that the use of reverse thrust for an aborted takeoff could be used if desired, and TWA in its Operating Manual and Flight Handbook for this aircraft specified the use of reverse thrust as one of the procedures that was to be used during an aborted takeoff. (Final Pretrial Order, pp. 4–5; Boeing's Answers to Interrogatories 5, 6; Exhibit 295.)

28. The thrust reverser system with which each of the engines of N769TW was fitted on November 23, 1964, was conceived by Boeing in 1956. It is a device attached to the rear of the engine which allows the pilot to use a part of the thrust to control the aircraft: it helps the pilot to stop the aircraft or to slow it down without the use of brakes by creating a force in the direction opposite that of the forward thrust. (Wood T. 1025; Exhibit 102.)

29. Each reverser uses a pair of clamshell doors to block off the rearward flow of the exhaust gas of the engine. The gas is then directed out through louvered vents at the sides of the engine to produce the reverse push or reverse thrust. (Wood T. 1027; Exhibit CQ.)

30. The thrust reverser is actuated by the throttle system which consists of an engine start lever and a thrust lever assembly with both a forward thrust lever and reverse thrust lever for each engine. (Exhibits 102, IA; CQ.)

31. The thrust reverser control system directs the operation of the clamshell doors and regulates the available

selection of thrust. The control system consists of the control cam assembly, the lockout control, the follow-up control crank and the clamshell door actuators. Under normal operation, movement of the reverse thrust lever rotates the control cam, which then positions directional valves to port Ps4 high pressure bleed air to the clamshell actuators. As the clamshell doors are driven toward the fully closed position, the actuator truck mechanism engages and moves the follow-up control crank, which in turn shifts the interlock position of the lockout control. The follow-up control stop is then moved, allowing the control cam to rotate further, and the connected reverse thrust lever to be advanced from a limited reverse thrust to maximum reverse thrust. (Exhibits 102, IA; CQ.)

32. Under normal operation, if the clamshell doors do not reverse sufficiently, the lockout control does not shift and movement of the reverse thrust lever is blocked by the follow-up control stop to a limited thrust condition (reverse interlock position). (Exhibits 102, IB; CQ, 3.)

33. On return from normal reverse thrust operation, as the reverse thrust lever is returned to idle, thrust is reduced, the clamshell doors stow, and the forward thrust lever is unlocked. If the clamshell doors do not stow, the lockout control does not shift and the movement of the forward thrust lever is blocked by the follow-up control stop (forward interlock position). (Exhibits 102, IB; CQ.)

34. Under normal operation, any inadvertent actuation of the clamshell doors also operates the interlock system by disrupting the position of the lockout control; this action in turn moves the follow-up stop which forces the control cam and connected thrust levers to return toward idle from a high thrust setting. (Exhibits 102, IB; CQ.)

35. The vertically pivoted clamshell doors are pneumatically activated by high pressure bleed air, which is carried through an air supply line which is divided into a number of tubing assemblies. (Exhibits 102, IA; CQ.)

36. The operation of the thrust reverser is dependent on the supply of air pressure through the air supply line. That pressure is necessary to actuate the piston in the actuating mechanism of the thrust reverser which in turn would open and close the clamshell doors on command from the pilot. A loss of air pressure from a disconnection of the air supply line would result in a concomitant loss of power to operate these clamshell doors. The continuous security of the air supply line is, therefore, essential to the operation of that system. (Exhibits 287 § 78–3–0, p. 1; 205, pp. 2–3.)

D. *Cause of the Occurrence*

37. The separation of the air supply line to the thrust reverser of the No. 2 engine occurred either during acceleration of the aircraft prior to the abort or during deceleration after the pilot activated the reverse thrust lever, and the loss of air pressure resulting from the separation caused a malfunction of the No. 2 engine thrust reverser system. (Exhibits 125, p. 57; 205 pp. 2–3; Schepisi Dep. 61–72.)

38. The malfunction of the No. 2 engine thrust reverser caused the No. 2 engine to develop a substantial forward thrust when reverse thrust was being called for. In trying to stop the aircraft, Captain Lowell also lost the use of the braking effect that full reverse thrust in all four engines would have produced. (Schepisi Dep. 65–72; Exhibits 205, p. 3; 102, p. 7; Wall T. 310–11; Kovitz T. 179–180.)

39. From the moment the first right-hand yaw began, until after the impact with the road roller, there was a continuous and strong tendency of the aircraft to veer to the right. The cause of the aircraft's continuous and strong tendency to veer to the right during the abort was an asymmetric thrust resulting from the malfunction of the No. 2 engine thrust reverser mechanism.

(Lowell Dep. 71–74; Schepisi Dep. 65–72; Wall T. 324, Kovitz T. 141; Exhibits 204, 205, CV, C–P, 5–12, 125.)

40. Captain Lowell would have been able to stop the aircraft from the location on the runway where the first right-hand yaw commenced before reaching the legal end of the runway with the use of approximately 75% of maximum braking and full reverse thrust. (Kovitz T. 168–70; Exhibit 194, p. 11.)

41. The asymmetric thrust resulted in a control problem that prevented Captain Lowell from stopping the aircraft before he reached the road roller. By using differential braking to overcome the asymmetric thrust, Captain Lowell was only able to utilize partial braking. (Lowell Dep. 75–76, 80, 110, 255; Kovitz T. 96–97, 105–112; Wall T. 314–319, 320–24, 326–37, Exhibits 205, p. 3, CD, P, OP. 8.)

42. The asymmetric thrust that was caused by the thrust reverser malfunction prevented Captain Lowell from steering the aircraft away from the road roller when the airplane was in close proximity to it. (Schepisi Dep. 65–72; Wall T. 314–19, 338; Exhibit CV.)

43. The immediate cause of the aircraft's striking the road roller was the asymmetric thrust that resulted from a malfunction of the No. 2 engine thrust reverser mechanism. (Schepisi Dep. 65–72; Exhibit 125, p. 57.)

44. The actions of the crew of N769TW prior to the abort and during the abort were in accordance with TWA and Boeing recommended procedures and did not constitute an intervening or concurrent cause of the occurrence. (Findings of Fact 7, 11, *supra*; Exhibit 125, p. 56.)

E. *Negligence and Breach of Warranty*

1) Ability of Thrust Reverser to Develop Substantial Forward Thrust.

45. Prior to delivery of the aircraft, a failure analysis was conducted by Boeing to examine the results of various component failures. Commencing with the control cables and proceeding through the control system into the clamshell door components, the different components were subjected to various failures. Each mechanical and pneumatical failure, including a separation of the air supply line, was stated to be in the fail-safe category as a result of the interlock system, clamshell hinge door moment, or other features of the system. (Exhibit 102; IIA.)

46. The defendant informed the pilots who were flying its aircraft in its Pilot Training Manual that there would be little directional control problem because of relatively low asymmetric thrust in the event of a thrust reverser malfunction. (Exhibit 289, App. C, p. 4.8B.)

47. Tests conducted after the accident revealed that an air supply line malfunction of the thrust reverser system on Boeing 707/331 aircraft with the interlock mechanism operating normally could produce a far greater forward thrust than Boeing had indicated. (Exhibit 205, p. 3.)

48. As this aircraft was designed and manufactured, large asymmetric thrust components could be produced by a malfunction of the thrust reverser system. This was an unreasonably dangerous defect in the design and manufacture of this aircraft because a large asymmetric thrust during landing or aborted takeoff maneuvers was a hazard to the safety of the aircraft and its passengers. This defective condition of the aircraft was a proximate cause of this occurrence. (Kovitz T. 172–81; Schepisi Dep. 65–72; Exhibits 205, p. 3; 102, p. 7.)

49. The defendant was negligent in failing to discover before delivering this aircraft to TWA and before this occurrence that large asymmetric thrust forces could occur as a result of a thrust reverser malfunction. This negligence was a proximate cause of the occurrence.

2) Lack of Proper Indicating Instrument.

50. A cockpit thrust reverser warning light was provided at the time of the

accident for each engine on N769TW to indicate when the clamshell doors of each thrust reverser system *had moved out* of the fully stowed position. (Weeks T. 565; Exhibit 309; Kovitz T. 82–83, 168.)

51. There was no indicating instrument or device in the cockpit of this aircraft to inform the flight crew that the clamshell doors of the No. 2 engine thrust reversing mechanism were not *in* the reverse thrust position. If the crew had known that the thrust reversing device of that engine was not working, the reverse thrust lever for that engine could have been brought back to the idle position and the asymmetric thrust would have been almost entirely eliminated. There would then have been no control problem. The absence of such an indicating instrument or device was a proximate cause of this occurrence. (Barzelay T. 1829, 1848; Kovitz T. 82–83; Wall T. 338; Lowell Dep. 110–112; Exhibits 205, p. 4; 309.)

52. A failure of the clamshell doors to close when reverse thrust was called for on this aircraft could produce a substantial asymmetric thrust and cause large yawing moments on this aircraft. The failure of this aircraft to have an indicating means to identify the thrust reverser malfunction as the cause of the yaw so that corrective action could be taken was an unreasonably dangerous defect.

53. Civil Air Regulation Section 4b.-604 was applicable to the design and manufacture of this aircraft. Paragraph (t) of Section 4b.604 provided that this aircraft was to be equipped with a powerplant instrument position indicating means to indicate to the flight crew when the thrust reverser device was in the reverse thrust position. (Weeks T. 586, Exhibit 213, pp. 153–154.)

54. An indicator that provided the crew with a positive indication that the reverser device was in the reverse thrust position was in use on other jet aircraft in 1960, including the Boeing 707/131 which is the domestic version of the

707/331, and TWA installed such an indicator on its 707/331 aircraft after the occurrence. (Salisbury Dep. 17–18, 27, 29; Exhibits 99, 128; Boeing Answer to Interrogatories 41–42.)

55. The thrust reverser system of this aircraft did not comply with Section 4b.604 of the Civil Air Regulations. The interlock system is not a sufficient substitute for an actual powerplant instrument as defined in the Regulations since it would not, even when working as designed, provide a positive indication of the position of the clamshell doors especially during a thrust reverse malfunction. (Barzelay T. 1829–31; Exhibits 125, p. 56; 205, p. 4.)

56. The defendant was negligent in failing to include an indicating means to the flight crew to inform them when the reversing mechanism was in the reverse thrust position. This negligence was a proximate cause of the occurrence. (Wall T. 338; Lowell Dep. 110–12; Exhibit 205, p. 4.)

3) Defective Tube Assembly.

57. The tube assembly (*i. e.,* tube, preset sleeve, and B-nut) that was found separated from the shuttle valve of the No. 2 thrust reverser was defective because of the out of round or elliptical condition of the sleeves. This out of round condition of the sleeve caused an interference fit between the sleeve and the B-nut that would give a mechanic a false sense of tightness. (van der Velden T. 1245; Levinson T. 503, 1891.)

58. The out of round condition of sleeve of the tube assembly in question caused the B-nut to back off the tube assembly. This resulted in the separation of the air supply line and the failure of the No. 2 thrust reverser system. (van der Velden T. 1242; Levinson T. 1891.)

59. Prior to November 23, 1964, TWA purchased most tube assemblies such as the particular unit in issue from Boeing which fabricated such tube assemblies by inserting a mandrel into the tube end to support the tube while the sleeve was clamped onto it (mandrel presetting). In rare cases based on the lo-

cal need for a specific piece, TWA also fabricated such tube assemblies from separate parts obtained directly from suppliers to Boeing specifications and design *without* use of mandrel presetting. (Fisher Dep. 141, van der Velden T. 1207–09; Prior Dep. 8, 16.)

60. Trademarks on the sleeve and B-nut of the particular tube assembly which separated from the shuttle valve of No. 2 engine indicate that they were manufactured by Parker Aircraft Company; the tube bears no trademark to identify its origin, but it bears distinct evidence of mandrel presetting. This evidence indicates that the tube assembly was originally fabricated by Boeing and furnished to TWA and not fabricated by TWA. (van der Velden T. 1207, 1358; Exhibits CC, 271.)

61. The evidence is inconclusive as to how or when the sleeve assumed its out of round shape. The evidence presented by plaintiffs that the defect existed from the date of manufacture and the evidence presented by Boeing that the defect was the result of improper maintenance are conflicting. On the one hand, the tube, which has a yield strength of 35,000 pounds per square inch compared to 178,000 pounds per square inch for the sleeve, should have also been deformed in the area of the sleeve if the defect was the result of improper maintenance (Yonker T. 1857–62); on the other hand, the elliptical condition of the sleeve could not have been the result of original fabrication (van der Velden T. 1256). Taking into further account the fact that such tube assemblies were constantly removed and replaced at various TWA inspections and overhauls, and that there is no way to determine its age or service record, the court finds that plaintiffs have not met their burden of proof as to the cause of this defect. (Prior Dep. 76, 82; Meador Dep. 216; Taggart T. 690; Exhibit DV.)

4) MS [1] Flareless Fittings.

62. The air supply line assemblage of each thrust reverser system consisted of a number of tubing assemblies all of which were joined or coupled by fittings known as MS flareless fittings. (Exhibits 177–179.)

63. Boeing had initially selected flared fittings as the component of those tube assemblies that connected the various parts of the pneumatic line together, but at TWA's request the fittings were changed to MS flareless fittings. (Exhibit 330.) The design, manufacture and assembly of the MS flareless fittings as well as the rest of the air supply assemblage, including materials and sizes, were done to Boeing specifications and drawings. (Meador Dep. 88; Fisher Dep. 141; Prior Dep. 8, 16; Exhibit 330.)

64. The flareless fittings used on the thrust reverser air supply lines of this aircraft contained a 17–4 PH stainless steel sleeve, which was a different sleeve material from that used on the flareless fittings of previously manufactured aircraft of the Boeing Company. The sleeve for this fitting was introduced into service on this engine thrust reverser system because of higher anticipated temperatures and to prevent corrosion. (Boeing Answers to Interrogatories 10, 11.)

65. The stainless steel sleeve for the flareless fittings of the thrust reverser air supply line of this aircraft was a different material than the B-nut used to tighten these flareless fittings holding the assemblies of the air supply line together. The mismatch of the materials resulted in a slight difference in the thermal expansion of the nut and sleeve so that at the temperature of this system the nut would expand approximately $1\frac{1}{2}$ times as much as the sleeve. (Levinson T. 498–501.) this difference in thermal expansion was not a cause of the loosening of the nut in this case and thus the slight mismatch of materials did not constitute negligence on Boeing's part or an unreasonably dangerous defect. (Pond T. 1165–71.)

[1]. Military Specifications.

66. The MS flareless fittings furnished for use by Boeing in the air supply lines of the thrust reverser have not been shown to have had a tendency to loosen in service. Seventy-three JT-4 engine-powered 707 aircraft in the Boeing configuration of N769TW were operated over a five-year period immediately prior to November 23, 1964, by six air carriers for almost 1,050,000 flight hours or 4,200,000 engine hours. Each engine of those aircraft was equipped with 14 flareless fittings of the type in issue; each airplane was equipped with four engines. Accordingly, those fittings were subjected to 59 million hours of operation, including approximately 366,882 landing operations during each of which the thrust reverser systems were used without reported separation or mishap. (Exhibit EC.)

67. Prior to November 23, 1964, neither TWA nor any other air carrier operating JT-4 engine-powered 707 aircraft reported a problem with a loose B-nut of the flareless fitting of the type in issue. (Fisher Dep. 63; Prior Dep. 7–8; Taggart T. 693, 699; Exhibits CL, 319.)

68. After the accident, TWA checked its fleet of 707 aircraft. Four B-nuts at four different locations in the tubing line were loose 1½ to 3½ turns. Only one of the nuts found loose was on a 707/331 aircraft employing the 17–4 PH stainless steel sleeve in issue in this case. This was the only test conducted by TWA after the accident. (Fisher Dep. 47–51; Exhibits 19, 86, 87; van der Velden T. 1337–40.)

69. The flareless fittings of the thrust reverser air supply line were not self-locking, and they were not lock-wired or safetied in any manner. The MS standard did not so require such lockwiring for this installation, and lockwiring was not generally used for such installation. (Boeing Admissions 61, 79; Levinson T. 506–07; Exhibits 198, 199.)

70. Failure to specify lockwiring for the fittings did not constitute negligence on Boeing's part, and this was not a defective condition of the aircraft or a cause of the occurrence.

71. The metals selected for the thrust reverser pneumatic lines are set out in the Military Specifications. (Exhibits 198, 199.) All of those metals are approved for use in combination up to the present time by those Military Specifications and by the G-3 Committee of the Society of Automotive Engineers. (Allin T. 733, 744.)

72. During the period 1956–1960 before this aircraft was delivered to TWA the results of tests conducted by other manufacturers, and by the United States Navy were reported during meetings at which Boeing's representatives were in attendance. These reports indicated that tests had disclosed problems with flareless fittings in hydraulic installations with temperature environments of 275° or greater. (Prete T. 514, 517–22.)

73. In October and November of 1958, approximately 1½ years before this airplane was delivered to TWA, reports from the Canadian National Aeronautical Establishment were sent to Boing showing the results of vibration tests conducted by the Canadian National Aeronautical Establishment. Those reports indicated that vibration could lead to the loosening of the flareless fittings, but the test results were affected by improper installation of fittings tested. (Exhibit 196; Hewitt Dep. 3–4; van der Velden T. 1359–60.)

74. In August of 1962, approximately two years and three months before this occurrence Boeing's Engineering Department submitted a report (Exhibit 184) which was widely distributed throughout the Boeing Company stating that the frequent loosening in service of the MS flareless fittings was a defect. The Boeing Engineering Department recommended twice in that report that the airlines be notified to periodically retighten the MS flareless fittings because of this loosening defect. Boeing never notified the airlines of any tendency of the MS flareless fittings to loos-

en or any need to periodically retighten them after this report was distributed. (Hemke T. 1631–32; Boeing Answers to Interrogatories 99, 30.) That failure was not a proximate cause of this occurrence, since loosening in service was not, in fact, a defect of the fittings used, Findings of Fact 66, *supra*, and did not constitute negligence on Boeing's part.

█ 75. The Military Specifications to which these flareless fittings were designed specified that the tubing material used was to be .049 inches in wall thickness at a maximum pressure of 3000 psi.[1] (Exhibit 199, p. 3.) Boeing used tubing material that was .028 inches in wall thickness in the thrust reverser system, which has a pressure range of 180 to 200 psi (Exhibit 177; van der Velden T. 1325). The use of this thinner tubing was a departure from the Military Specifications, which may have affected the tightening torque that could be used on these fittings. (Schweiso Dep. 20–21; Exhibit 117, p. 1.) The thinness of the tubing, however, was not a cause of the occurrence in this case, and the departure has not been shown to constitute negligence or an unreasonably dangerous defect.

76. The Military Specifications which Boeing accepted as the design criterion for the MS flareless fittings used in the thrust reverser air supply lines required complete qualification testing including endurance testing to prove their acceptability. (Prete T. 522; Exhibit 199.) Boeing failed to perform such qualification or endurance tests on the MS flareless fittings that were used in the air supply line of the thrust reverser mechanism at any time before or after delivering these aircraft to TWA, but the evidence does not warrant a finding that the testing would have revealed inadequacies of the fittings or that the failure to test was a cause of the occurrence. (Findings of Fact 66, *supra*.) Thus no negligence or an unreasonably dangerous defect is attributable to Boeing in this regard.

### III. CONCLUSIONS OF LAW

Jurisdiction and venue are not disputed, and the court's previous rulings on the law applicable to each Count are incorporated by reference herein. Manos v. TWA, 295 F.Supp. 1170 (N.D.Ill. 1969).

#### A. *Breach of Warranty under the Law of Washington*

Plaintiffs have not offered proof of any express warranties of Boeing and indeed have stated in answer to a Boeing interrogatory that they have no knowledge of any such warranty. Count I thus rests on the doctrine of implied warranty under the law of the State of Washington.

█ Under the law of Washington, a manufacturer is strictly liable to third parties not in privity who are injured by a defective, unreasonably dangerous product. Ulmer v. Ford Motor Company, 75 Wash.2d 522, 452 P.2d 729 (1969). In *Ulmer*, the Washington Supreme Court reviewed the law of implied warranty in Washington and adopted as controlling law on the issue Section 402A of the Restatement of Torts (Second):

"§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

---

1. Per square inch.

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

To recover under the doctrine of implied warranty or strict liability under Section 402A, plaintiff must prove: "1) that there was a defect, 2) which existed at the time the product left the hands of the manufacturer, 3) which was not contemplated by the user, 4) which renders the product unreasonably dangerous, and 5) that such defect was the proximate cause of plaintiff's injury." Ulmer v. Ford Motor Co., *supra*, at 736 (Marshall A. Neill, Judge, concurring). *See also* Suvada v. White Motor Co., 32 Ill.2d 612, 623, 210 N.E.2d 182, 188 (1965); Dagley v. Armstrong Rubber Co., 344 F.2d 245 (7th Cir. 1965).

This court has found, *supra*, that the ability of the thrust reverser of the aircraft in question to develop substantial forward thrust was an unreasonably dangerous defect which was a proximate cause of the occurrence and plaintiffs' injuries. The court has made the same findings as to Boeing's failure to provide an instrument to indicate that the clamshell doors were in the reverse thrust position. There is no question that both defects existed at the time Boeing delivered the aircraft to TWA or that the defects were not contemplated by the plaintiffs.

Boeing argues that the Washington rule of implied warranty or strict liability does not apply to the present actions. It states that the right of plaintiffs to recover must be determined as of 1965, the time of the commencement of the action, Associated Indemnity Corp. v. Wachsmith, 2 Wash.2d 679, 99 P.2d 420 (1940), and that the *Ulmer* decision was the first Washington case to establish the doctrine of implied warranty without privity and to adopt the strict liability theory of Section 402A.

The argument is unfounded. The court in *Ulmer* referred to earlier Washington cases, in effect at the time the present action was commenced, as follows:

"there is a warranty implied in law (and not dependent on the warranty provisions of the Uniform Sales Act) * * *. The warranty is not dependent on contract, does not require privity, and is available to all who may suffer damage by reason of the product's use in the legitimate channels of trade." 75 Wash.2d 522, 452 P.2d 729 at 731.

At the very least, such earlier cases had established the doctrine of implied warranty without privity of contract or proof of negligence where a product carried an unreasonable risk of harm. *See* Brewer v. Oriard Powder Co., 66 Wash. 2d 187, 401 P.2d 844 (1965); Dipangrazio v. Salamonsen, 64 Wash.2d 720, 393 P.2d 936 (1964); Wise v. Hayes, 58 Wash.2d 106, 361 P.2d 171 (1961). An aircraft would certainly qualify under such earlier case law as a product which carries an unreasonable risk. Furthermore, such cases may be said to have adopted strict liability without negligence or privity as to manufacturers of all types of products. *See* Prosser, The Fall of the Citadel, 50 Minn.L.Rev. 791 (1966), where the author so lists Washington, prior to *Ulmer*, among 18 other states. It is therefore clear to this court, on the basis of the cases cited above and the references to them made in *Ulmer*, that the *Ulmer* court was not making a departure from prior Washington law, but was refining and relabeling it.

Moreover, the Washington Supreme Court has indicated, in a case decided after *Ulmer*, its position on this issue. In Brown v. Quick Mix Co., Division of Koehring Co., 75 Wash.2d 833, 454 P.2d 205, 207–208 (1969), a products liability action originally filed after *Ulmer* on April 20, 1965, the court stated that privity of contract was not required and that the law as enunciated in *Ulmer* was applicable to the case. 454 P.2d at 208.

It is therefore apparent to this court that *Ulmer* is applicable to the present case, and that plaintiffs have met their burden of proof under it.

 Boeing makes a final argument that Count I of the Fourth Amended Complaint is deficient for the failure to allege that there was no substantial change in N769TW and its components between the date of delivery and the date of the accident. Rossignol v. Danbury School of Aeronautics, Inc., 154 Conn. 549, 227 A.2d 418 (1967). It is clear to this court that the Fourth Amended Complaint is sufficient in charging a breach of implied warranty to meet the "short and plain statement of the claim" standard of Rule 8 of the Federal Rules of Civil Procedure. *See, e. g.,* Conley v. Gibson, 355 U.S. 41, 47–48, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

## B. *Negligence Under the Law of Italy.*

Both parties provided the court with expert testimony concerning the law of Italy. Professor Corrado Medina of Calgari University in Italy, who has written the only treatise on the subject of an aircraft manufacturer's liability to third parties for manufacturing defects, *Problemi Giurdiu Relative Alla Costruzione Dell Aeromobile* (1965) (hereinafter "Medina Treatise"), testified for plaintiffs. Professor Andreas Heldrich, a member of the Committee of Experts for the Comparative Study of European Laws at the Council of Europe, and Gerardo Boniello of the Milan Bar, testified for Boeing.

Italy, as all modern continental European countries, is a member of the Romano-Germanic or civil law family. In contrast with the Anglo-American or common law legal systems, the responsibility for establishing the framework of the legal order rests solely with legislative, executive and administrative authorities in the civil law systems. Legal rules or doctrines are not formulated by the courts, and judicial decisions do not create rules of law. Comprehensive civil law codes attempt to provide an organized system of general rules from which a solution may be judicially deduced in any given instance. The common law doctrine of precedent, or *stare decisis,* whereby judges abide by rules previously applied by other courts, is rejected by the civil law systems. A judge confronted with the question of applicability of a statute in a given situation is not bound to do what other judges have previously done under the same or analogous circumstances, nor may he justify his decision by citing previous judicial decisions. The application of a statute to a particular legal question survives only as long as individual judges, and the legal scholars who may influence their thinking, consider such an application valid. *See generally* David and Brierley, Major Legal Systems in the World Today (English ed. 1968).

The experts for both parties agree that the precise case in issue—a suit by injured passengers against an aircraft manufacturer—has not been presented to the Italian courts. This court must look to the relevant Italian statutory authorities, as would an Italian court.

Plaintiffs rely on the general tort provisions of the Italian Civil Code. Article 2043, the paramount rule of tort liability, provides:

"Any deliberate or negligent act which causes unjust damage to another imposes an obligation on the person who committed the act to make reparation for the damage." (Army Service Forces Manual, M 354–3D, Civil Affairs).

The expert testimony at trial indicated that this section requires the concurrence of three elements—causation, negligence, and damage—and that plaintiffs bear the burden of proof as to all three.

Concerning causation, Article 2055 of the Civil Code provides: "If the event is to be considered caused by more (than one) person, all are jointly liable for damages." A final relevant general provision is the Article 2049 by which employer such as Boeing is made liable for the improper acts of its agents and employees.

Boeing contends that the general provisions are not applicable here because the Italian Code of Navigation preempts the general provisions, or at least impliedly excludes them in the present case.

Article 1 of the Code of Navigation provides:

"Maritime, inland and aerial navigation shall be governed by the present code, by the laws, regulations, corroborative rules and the usages relating thereto. *In default of provisions of the law of navigation and in the event the latter may not be applied by analogy, civil law shall apply.*" (Emphasis added.) (Medina T. 432)

Article 942 of the Code, which is part of the Italian enactment of the Warsaw Convention, provides:

"The carrier is liable for the damage arising from the delay and the unfulfillment of the transportation as well as from accidents hurting the passenger's person from the beginning of the embarkment operations up to the end of those disembarkment operations *unless he proves that he and his servants and agents have taken all the necessary and possible measures in accordance with normal diligence to avoid damage.*" (Emphasis added.) (Medina T. 433)

Boeing argues that Article 942, by expressly placing liability upon the carrier, impliedly excludes liability of the manufacturer. It relies by analogy on Triches Alini v. Societa F.I.A.T., corte d'Appello di Torino, January 30, 1960: Foro Italiano 1960, I 1026–1035, and Sorio v. Societa F.I.A.T., Cass. July 15, 1960: Foro Italiano 1960, I 1714–1716, both of which involved suits by injured third parties, i. e., not the owner or driver, against the automobile manufacturer under general Italian tort principles for alleged manufacturing defects in the automobile. The courts were faced with Article 2054 of the Civil Code, which provides:

"The driver of a vehicle not on rails is obligated to make restoration for damages caused to persons or things by the circulation of the vehicle if he does not prove that he used all his utmost diligence to avoid the damage. * * * The owner of the vehicle is jointly liable with the driver if he does not prove that the circulation of the vehicle was against his will. *The driver and owner are liable for damages deriving from defects in the construction and manufacture of the vehicle or defects in the overhauling of the vehicle.*" (Emphasis added.)

On the basis of Article 2054, these courts reasoned that the Italian parliament, in expressly making the driver and owner strictly liable for manufacturing defects under that Article, impliedly excluded the automobile manufacturer's liability under general tort provisions for the same defects. They accordingly held that the act of placing the automobile into traffic frees the manufacturer of subsequent liability to third parties and that an automobile manufacturer is not liable to third parties under general tort law for damage caused by manufacturing defects of the automobile during its operation.

Plaintiffs' expert, Professor Medina, testified that the differences between Article 2054 of the Civil Code and Article 942 of the Code of Navigation are apparent. Article 942 places only a limited, presumed liability upon the carrier which can be avoided if the carrier proves diligence on its part; no mention is made of manufacturing defects. It is difficult to believe that the Italian parliament intended to create a situation in which injured passengers of a defective aircraft would have no recourse because the carrier could prove normal diligence in not discovering and correcting a proven manufacturing defect. Rather, it seems clear, as Professor Medina testified, that the holdings in the automobile cases depended upon the exceptionally strict liability placed on the owner and driver of the vehicle, and that this special situation is not analogous to Article 942. *See* Geri, *Responsabilita senza colpa per danni derivati da vizi di costru-*

*zione del veicolo;* Diritto e pratica delle Assicurazioni 1961, at p. 148. This is further supported by the fact that Boeing's experts would only state that it was a "possibility" that an Italian court, given the present case, would come to the same result as in the automobile cases.

The court agrees with Professor Medina, a persuasive witness, that the Code of Navigation simply does not reach the question of an aircraft manufacturer's liability and that, under Article 1 of the Code of Navigation, *supra,* the general tort rules of the Civil Code must be applied. *See* Medina Treatise, at 121–22.

■ Under the general Italian tort principles discussed above, and on the basis of the court's prior findings, the plaintiffs have proven Boeing's negligence. This court has found that Boeing was negligent in designing and manufacturing a thrust reverser which could develop substantial forward thrust during a malfunction and in failing to discover this defect; that Boeing negligently failed to comply with Civil Air Regulations requiring an instrument to indicate that the clamshell doors are in the reverse thrust position; and that this negligence was a proximate cause of the occurrence and damage.

Boeing finally argues, however, that plaintiffs cannot succeed under the general tort provisions of the Italian Civil Code because they have failed to meet the causation requirement of Italian law. They first contend that the automobile cases, cited earlier, held that the only relevant cause of injury to the third parties was the operation of the automobile by the driver or owner and that, by analogy, the operation of the aircraft by TWA was the only legal cause here. This is but another version of the argument made under the Code of Navigation, and rejected by this court, that an aircraft manufacturer's liability is impliedly excluded by Article 942 of the Code of Navigation. Again the analogy is not apt, for as stated in *Geri, supra,* at 148:

"If Article 2054 did not contain this provision [placing strict liability on the driver or owner] there is no doubt that the manufacturer's liability in tort would exist because *the defect itself would together with the placing in circulation of the automobile be a coexisting cause necessary and sufficient to the production of the damage.*" (Emphasis added.)

Boeing next contends that even if its negligence is not automatically superseded by TWA's operation of the aircraft, the causal connection was interrupted by subsequent acts of TWA, including the operation of N769TW by its crew and improper maintenance of its thrust reverser system. Professor Medina testified, however, that Italian law concerning causation is the same as that expressed in the case of Boeing Airplane Company v. Brown, 291 F.2d 310 (9th Cir. 1961). That case involved the crash of a military aircraft, manufactured by Boeing, due to a defective alternator drive. Boeing there contended that the intervening negligence of the operator of the aircraft, the United States Air Force, superseded its own negligence in design and manufacture of the defective aircraft. The court held that there was no superseding cause relieving Boeing of liability and stated at 291 F.2d 317:

"It will be assumed for present purposes that the Air Force was negligent in failing to discover the defect in the design of the alternator drive up to the time the plane was accepted. In that event the Air Force, chargeable with knowledge of the defect, was also negligent in permitting the plane to be operated on the day of the crash. The latter negligence would be intervening since it occurred after Boeing had released the plane to the Air Force.

"But this intervening negligence, if any, would not be a superseding cause operating to relieve Boeing of liability. Obviously the defective condition of the plane could cause harm only if

the plane were operated in that condition. The happening of the very event the likelihood of which made the actor's conduct negligent cannot under California law be a superseding cause relieving him from liability." Reid & Sibell, Inc. v. Gilmore & Edwards Co., 134 Cal.App.2d 60, 65, 285 P.2d 364, 368.

The court succinctly stated the applicable law as follows, 291 F.2d at pp. 317–318:

"Under California law an intervening independent act of negligence interrupts the causal connection between the initial negligence and the resultant injury only if the subsequent wrongdoer's act could not have been anticipated by the first actor in the exercise of due care."

■ Under this standard, it is clear that the defective tube in the thrust reverser system of the No. 2 engine, which this court has found was a cause of the occurrence, would not be a *superseding* cause of the occurrence so as to relieve Boeing of liability, nor would the marginal rigging of the No. 2 thrust reverser switch by TWA. The intervening independent negligence, to whomever it is attributable, clearly should have been anticipated by Boeing in the exercise of due care. The thrust reverser should have been so designed that a loosening of the tube in the thrust reverser system would not result in the tremendous control problem that resulted here. Minimally, Boeing had a duty to provide an instrument in accordance with FAA regulations which would have indicated the malfunction to the crew. Intervening negligence of the flight crew, urged by Boeing, is not supported by the evidence, as the court's findings of fact, *supra*, reflect. Thus the causal connection between the defect and the occurrence has been clearly established, and accordingly all elements of Boeing's liability under Article 2043 of the Italian Civil Code have been established by plaintiffs.

## ORDERS

It is therefore ordered that Boeing's evidentiary objections be, and they are hereby overruled, and that plaintiffs' evidentiary objections be, and they are hereby overruled in part and sustained in part.

It is further ordered that Boeing's motions to dismiss and strike Count I, to dismiss and strike Count II, and to dismiss the cause be, and they are hereby denied.

It is further ordered that interlocutory judgment be entered for plaintiffs as to Boeing's liability under Counts I and II of the Fourth Amended Complaint.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO AMEND JUDGMENT OR FOR NEW TRIAL

The defendant moves this court to amend its memorandum opinion and interlocutory judgment order entered on January 11, 1971, or, in the alternative, for a new trial. For the reasons stated, this court is of the opinion the motion should be denied.

■ The plaintiffs contend that this motion is untimely because it was served more than 10 days after the court entered judgment. Rule 59(b) and (e), Federal Rules of Civil Procedure. However, since the judgment order in question was interlocutory and not a final order, these provisions of Rule 59 are not applicable.

The defendant asks the court to amend its decision on the issue of liability by deleting Findings of Fact 37, 48 and 53, on the grounds that these findings are erroneous and are contrary to the preponderance of credible evidence adduced at trial. In its memorandum opinion, the court stated the specific evidence upon which each of these findings was based. The defendant's motion to delete these findings is without foundation, and will therefore be denied.

■ The defendant also asks this court to consider an item of newly dis-

covered evidence either as a basis for deleting Finding of Fact 53, or as a basis for a new trial. That item purports to be a letter from the Civil Aeronautics Administration to the defendant concerning reverse thrust position indicators on the Boeing 707 aircraft. The defendant admits that the letter was found in its own files, and was in its possession long before trial on the issue of liability began over a year ago. In explanation of its extreme delay in offering this item of evidence, the defendant states that it was not aware until two weeks before trial that plaintiffs would claim the Boeing 707 aircraft in issue violated Section 4b.604 of the Civil Air Regulations by failing to have an indicator which would identify a thrust reverser malfunction. However, long before trial the defendant was well aware from the pleadings that the plaintiffs claimed that the failure of the defendant to equip the Boeing 707 with an adequate indicator system to warn the Trans World Airlines crew of the malfunctioning reverse system constituted negligence. See, e. g., Fourth Amended Complaint, Paragraph 9 of Count I, Paragraph 10 of Count II, and Paragraph 9 of Count III. Prior to trial, the plaintiffs advised the defendant precisely which provisions of the Civil Air Regulations they were to rely upon at trial, including Section 4b.604. Under all of the circumstances, the defendant cannot complain that the evidence adduced at trial regarding the absence of such an indicator was a "surprise." Nor has the defendant made a sufficient showing to explain its inordinate tardiness in locating this item of evidence or that this evidence would probably change the court's ruling on the issue of liability. Rule 60(b), Federal Rules of Civil Procedure; Giordano v. McCartney, 385 F. 2d 154 (3rd Cir. 1967).

It is therefore ordered that the defendant's motion to amend the judgment or, in the alternative, for a new trial be, and it is hereby denied.