EASTERBROOK, Chief Judge.
From the mid-1950s through 1991, Société des Anciens Etablissements Martin S.A. (“Martin”) distributed a successful French-press coffee maker known as the Chambord. A French-press coffee maker (called a cafetiére á piston in France) is a carafe in which hot water is mixed with coffee grounds. When the brewing is complete, a mesh screen attached to a rod drives the grounds to the bottom of the carafe. Clear coffee then can be poured from the top. In 1991 Bodum Holding purchased all of Martin’s stock. Today subsidiaries of Bodum Holding sell throughout the world coffee makers that use the Chambord design and name.
Martin’s principal investor and manager was Louis-James de Viel Castel, who had other businesses. One of these, the British firm Household Articles Ltd., sold a French-press coffee maker that it called La Cafetiére, which closely resembles the Chambord design. Viel Castel wanted to continue Household’s business after Bodum bought Martin. So Viel Castel and Jprgen Jepsen Bodum, the main investor in Bodum Holding, negotiated. An early draft agreement provided that Household could sell the Chambord design in the United Kingdom, but nowhere else. After several rounds of revisions, however, the agreement provided that Household would never sell a French-press coffee maker in France, that it would not use the trade names Chambord or Melior, and that for four years it would not distribute through the importers, distributors, or agents that Martin employed during 1990-91. The agreement was signed, and Bodum Holding acquired Martin.
La Cafetiére, Inc., was incorporated in Illinois in 2006 to serve as the distributor of Household’s products in the United States. One of these is the La Cafetiére model, which carries the name “Classic” in this country. To avoid confusion between the corporation (which since 2008 has been one of Household’s subsidiaries) and the product, we refer to the distributor as “Household.” Household has itself been renamed The Greenfield Group, but we stick with the original name for simplicity. Bodum Holding’s U.S. distributor (Bodum USA, Inc.) filed this suit under federal and state law, contending that the sale of any coffee maker similar to *626 the Chambord design violates Bodum’s common-law trade dress. Trade dress, a distinctive appearance that enables consumers to identify a product’s maker, is a form of trademark. See Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). The Chambord design is not registered as Bodum’s trademark, but common-law marks may be enforced under both 15 U.S.C. § 1125(a), a part of the Lanham Act, and 815 ILCS 510/2(a). Household contends that the 1991 agreement permits it to sell the La Cafetiére design anywhere in the world, except France, provided that it does not use the words Chambord or Melior&emdash;and Household has never used either of those marks. The district court agreed with this contention and granted summary judgment in Household’s favor. 2009 U.S. Dist. Lexis 25555 (N.D.Ill. Mar. 24, 2009).
The Chambord design and the La Cafetiére design are indeed similar, and although they are not identical a casual coffee drinker (or purchaser) would have trouble telling them apart. Here are pictures:
[[Image here]]
[[Image here]]
*627 [[Image here]]
[[Image here]]
The right-hand version of the La Cafetiére design looks closer to the Chambord design because of the domed lid and the ball on the piston. Household calls one design the Classic and the other the Optima; the parties do not make anything of the difference.
Bodum assumes that the proprietor of any distinctive design has an intellectual-property right in this design, which it alone can sell. That assumption is unwarranted. The Chambord design is distinctive&emdash;so much so that Martin received a design patent for it&emdash;but the patent expired many years ago. After a patent expires, other firms are free to copy the design to the last detail in order to increase competition and drive down the price that consumers pay. See, e.g., Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989); Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964). See also Jay Franco & Sons, Inc. v. Franek, 615 F.3d 855 (7th Cir.2010); Specialized Seating, Inc. v. Greenwich Industries, L.P., 616 F.3d 722 (7th Cir.2010). A distinctive design may be protected as a trademark only if it has acquired secondary meaning&emdash;that is, if consumers associate the design with a particular manufacturer&emdash;and the design’s identifying aspects are not functional. See Wal-Mart Stores, Inc. v. Samara Brothers, Inc., 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). Bodum has not produced evidence that the Chambord design has secondary meaning, so that purchasers of a La Cafetiére coffee maker think that they are getting one of Bodum’s products. But because Household has not asked us to affirm the district court on this ground, we move on to the contract.
Here is the critical language, from Article 4 of the contract:
In consideration of the compensation paid to Stockholder [Viel Castel] for the stocks of [Martin,] Stockholder guarantees, limited to the agreed compensation, see Article 2, that he shall not&emdash;for a period of four (4) years&emdash;be engaged directly or indirectly in any commercial business related to manufacturing or distributing [Martin’s] products....... *628 Notwithstanding Article 4 [Bodum Holding] agrees that Stockholder through Household ... can manufacture and distribute any products similar to [Martin’s] products outside of France. It is expressly understood that Household [ ] is not entitled, directly or indirectly, to any such activity in France, and that Household [] furthermore is not entitled, directly or indirectly, globally to manufacture and/or distribute coffeepots under the trade marks and/or brand names of “Melior” and “Chambord,” held by [Martin]. Stockholder agrees that Household [ ] is not entitled to use for a period of four (4) years the importers, distributors, and agents which [Martin] uses and/or has used the last year. Any violation of these obligations will constitute a breach of Stockholder’s obligation according to Article 4.
The parties agree that this is an accurate translation of the French original, and that French substantive law governs its interpretation. The district judge thought that the contract is clear and that Household can sell its La Cafetiére outside of France, if it does not use the Chambord or Melior names. Even if the La Cafetiére or Classic model is identical to the Chambord model (which it is not, as a glance at the illustrations shows), a thing identical to something else also is “similar” to it.
Bodum contends that, under French law, the parties’ intent prevails over the written word. Article 1156 of the French Civil Code provides: “One must in agreements seek what the common intention of the contracting parties was, rather than pay attention to the literal meaning of the terms.” (Again this is an agreed translation, as are all other translations in this opinion.) Jqrgen Bodum has submitted an affidavit declaring that he understood the contract to limit Household’s sales of the La Cafetiére model to the United Kingdom and Australia. This means, Bodum Holding insists, that there must be a trial to determine the parties’ intent. It supports this position with the declaration of Pierre-Yves Gautier, a Professor of Law at Université Panthéon-Assas Paris II, who Bodum tenders as an expert on French law. Household has replied with declarations from two experts of its own.
Although Fed.R.Civ.P. 44.1 provides that courts may consider expert testimony when deciding questions of foreign law, it does not compel them to do so-—for the Rule says that judges “may” rather than “must” receive expert testimony and adds that courts may consider “any relevant material or source”. Judges should use the best of the available sources. The Committee Note in 1966, when Rule 44.1 was adopted, explains that a court “may engage in its own research and consider any relevant material thus found. The court may have at its disposal better foreign law materials than counsel have presented, or may wish to reexamine and amplify material that has been presented by counsel in partisan fashion or in insufficient detail.”
Sometimes federal courts must interpret foreign statutes or decisions that have not been translated into English or glossed in treatises or other sources. Then experts’ declarations and testimony may be essential. But French law, and the law of most other nations that engage in extensive international commerce, is widely available in English. Judges can use not only accepted (sometimes official) translations of statutes and decisions but also ample secondary literature, such as treatises and scholarly commentary. It is no more necessary to resort to expert declarations about the law of France than about the law of Louisiana, which had its origins in the French civil code, or the law *629 of Puerto Rico, whose origins are in the Spanish civil code. No federal judge would admit “expert” declarations about the meaning of Louisiana law in a commercial case.
Trying to establish foreign law through experts’ declarations not only is expensive (experts must be located and paid) but also adds an adversary’s spin, which the court then must discount. Published sources such as treatises do not have the slant that characterizes the warring declarations presented in this case. Because objective, English-language descriptions of French law are readily available, we prefer them to the parties’ declarations. See Sunstar, Inc. v. AlbertoCulver Co., 586 F.3d 487, 495-96 (7th Cir. 2009); Abad v. Bayer Corp., 563 F.3d 663, 670-71 (7th Cir.2009).
Article 1156 says that courts must seek the parties’ “common intention” — which means their joint intent, not one side’s unilateral version. Jprgen Bodum tells us what he understood by the contract, but Bodum Holding does not offer any evidence of statements by Viel Castel that would tend to demonstrate that this view is mutual. For its part, Household offers the contract’s negotiating history, which French law takes to be a more reliable indicator of intent than the litigants’ self-serving declarations. See Alberto Luis Zuppi, The Parol Evidence Rule: A Comparative Study of the Common Law, the Civil Law Tradition, and Lex Mercatoria, 35 Ga. J. Int’l & Comp. L. 233, 258-60 (2007).
Article 1341 of the Civil Code forbids evidence about what negotiators said to one another — often called parol evidence in the United States — when the value of the dispute exceeds 5,000 francs (roughly 800 euros). The value of the dispute between Bodum and Household exceeds 5,000 francs, so what the negotiators said to each other is irrelevant under Art. 1341. This constraint illustrates the proposition that although “as a general rule, French and German law do not limit the admissibility of relevant external materials in the process of interpretation ... this does not mean that it is easy for a party to induce a court to rely on extrinsic evidence in order to ‘add to, vary or contradict a deed or other written instrument.’ On the contrary, civilian systems are acutely aware of the need to strike a balance between the desire to achieve a materially ‘right’ outcome on the one hand, and the struggle for legal certainty on the other. As a consequence, they are extremely reluctant to admit that the wording of a contract concluded in writing might be overridden by other factors.... Extrinsic evidence can, however, be used for the purposes of interpreting a written document that contains internal contradictions or is otherwise unclear” — something true of American law as well. Stefan Vogenauer, “Interpretation of Contracts: Concluding Comparative Observations,” in Contract Terms 123, 135-36 (Andrew Burrows & Edwin Peel eds.2007).
Article 110-3 of the Commercial Code is more tolerant of oral parol evidence, but it is not clear whether the Commercial Code governs the sale to Bodum Holding of Viel Castel’s stock in Martin. The Commercial Code applies to “all obligations between dealers, merchants, and bankers”. Art. 110-2. The contract by which Viel Castel sold his stock was a hybrid, affecting the business of Household as a merchant at the same time as it affected Viel Castel as an investor. It is unnecessary to decide whether Art. 110-3 applies, however, because Bodum Holding does not offer any parol evidence that would tend to show Viel Castel’s oral agreement with Jprgen Bodum’s beliefs. This leaves the written record.
*630 The negotiating history is straightforward. Bodum’s lawyers submitted an initial draft for Viel Castel’s consideration. The relevant provision said this:
In consideration of the compensation paid to Stockholder [Viel Castel] for the stock of [Martin,] Stockholder guarantees that he shall not — for an indefinite period of time — be engaged directly or indirectly in any commercial business related to manufacturing and/or distributing [Martin’s] products.......
Notwithstanding article 4 [Bodum Holding] agrees that Stockholder through Household ... can manufacture and distribute any products within the United Kingdom. It is expressly understood that Household [ ] is not entitled, directly or indirectly, to distribute products outside the United Kingdom.
Viel Castel rejected this proposal and negotiated to allow Household the right to sell the La Cafetiére design outside the United Kingdom. The next draft said this:
Notwithstanding Article 4 [Bodum Holding] agrees that Stockholder [Viel Castel] through Household ... can manufacture and distribute any products within the United Kingdom. It is expressly understood that Household [ ] is not entitled, directly or indirectly, globally to manufacture and/or distribute coffee-pots under the trade marks and/or brand names of “Melior” and “Chambord”. [Bodum Holding] agrees that Household [] with the limitation mentioned in the previous sentence outside of the United Kingdom on markets where Household [] prior to signing of this Agreement has proved to [Bodum Holding] that he is already manufacturing/distributing products can manufacture and distribute products which, directly or indirectly, do not compete with the business of the Company as run today.
This, too, was unacceptable to Viel Castel. Eventually the parties signed the final version that we quoted several pages ago. The lesson is easy to grasp. The initial draft placed on Household the sort of restriction that Jprgen Bodum imputes to the final version. But the final version allows Household to sell the La Cafetiére design anywhere except France — provided that it does not use the Chambord or Melior names (which Household has never done) and does not use Martin’s supply channels for four years (a promise Household kept).
The Cour de Cassation (France’s highest civil court) has concluded that a clear and precise contract must not be “denatured” by resort to one party’s declaration of intent. See Jacques H. Herbots, “Interpretation of Contracts” in The Elgar Encyclopedia of Comparative Law 334-35 (2006); Cass. 2e civ., March 8, 2006, Bull. Civ. II, No. 66. Article 4 of this contract is clear and precise as it stands; the negotiating history shows that it means what it says. And we are not the first court to reach this conclusion. Bodum and another of Household’s subsidiaries litigated in Denmark. Relying heavily on the negotiating history, the Court of Randers concluded, in a judgment dated February 8, 2008 (Case FS 40-6066/2007), that Article 4 means exactly what the district judge held in this litigation. The Court of Randers reached its judgment under French law (which a choice-of-law clause in the contract requires). The judgment was affirmed by the Western Danish High Court on May 12, 2009 (Appeal No. V.L. B-0329-08, Ref. No. 138212). It would not be sensible to create an international conflict about the interpretation of this contract. Denmark is a civil-law nation, and a Danish court’s understanding and application of the civil-law tradition is more likely to *631 be accurate than are the warring declarations of the paid experts in this litigation.
When the facts are undisputed, interpretation of contractual language is a question of law for the judge. See PSI Energy, Inc. v. Exxon Coal USA, Inc., 17 F.3d 969, 971 (7th Cir.1994). Bodum contends that the French preference for intent over text means that interpretation must be a question of fact. But in the United States, too, contractual interpretation seeks to find the parties’ shared intent. And in the United States, as in France, this is done by objective means (through devices such as the negotiating history) rather than attempting to read the parties’ minds. See Skycom Corp. v. Telstar Corp., 813 F.2d 810 (7th Cir.1987).
If this dispute were proceeding in France, it would not be submitted to lay jurors (which France does not use) or even to a judge. It would be submitted to an arbitral panel of business executives, the International Court of Commerce in Paris, as Article 18 of the contract provides. Bodum has not asked that this dispute be arbitrated, in Chicago or Paris, although that might have been preferable. That the suit depends on a mixture of U.S. trademark law and French contract law would not prevent arbitration. See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); Omron Healthcare, Inc. v. Maclaren Exports Ltd., 28 F.3d 600 (7th Cir.1994); Baxter International, Inc. v. Abbott Laboratories, 315 F.3d 829 (7th Cir.2003). Having chosen to litigate in Chicago rather than arbitrate in Paris, however, Bodum must abide by the forum’s procedural doctrines, such as the allocation of tasks between judge and jury. See Mayer v. Gary Partners & Co., 29 F.3d 330 (7th Cir.1994).
Bodum insists that, if the 1991 contract means what we have concluded it means, the agreement is invalid as a “naked license” of a trademark. American law forbids “naked” transfers of trademarks. TMT North America, Inc. v. Magic Touch GmbH, 124 F.3d 876 (7th Cir.1997). A business cannot sell a name divorced from a product, because a trademark is significant only to the extent it helps consumers associate a product with a producer. But Bodum did not sell a naked trademark to Household. Before 1991, Martin and Household had allocated rights to the Chambord design: Martin sold coffee makers embodying this design in some nations, Household in others. The 1991 contract continued that division. The names Chambord and Melior went to Bodum; the design stayed where it was, and Household promised not to sell it in France, where in 1991 Martin did about 70% of its business. No transfer of any rights to Household occurred; the transfer was from Martin to Bodum, with a reservation of some existing rights in Household. People are free to use contracts to allocate rights to products’ designs. See Aronson v. Quick Point Pencil Co., 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979).
None of the other arguments requires discussion. The judgment is affirmed.