WILLIAM E. SMITH, Chief Judge
This is the latest chapter of a transatlantic saga pitting an Italian producer of diagnostic medical instruments, Alifax Holding SpA, against its Rhode Island-based competitor, Alcor Scientific, Inc., and its itinerant former employee, Francesco Frappa. In this motion for partial summary judgment, Alifax has asked the Court to answer the following question: which jurisdiction's law should define the alleged duty of confidentiality owed by Frappa to his Italian ex-employer? The answer: Italy's.
Frappa's contractual employment relationship with Sire Analytical S.r.l., an Italian company acquired by Alifax, is the only conceivable source of his alleged duty of secrecy. His decade-long employment relationship was negotiated, consummated, performed, and terminated in Italy. Neither Frappa nor his work for Sire were connected in any way to Rhode Island. Alifax's claim for trade secret misappropriation under a Rhode Island statute based on acts that occurred within the state does not alter the source of his alleged duty. Accordingly, Italian law governs the substance of Frappa's alleged duty of confidentiality to Alifax in this action.
I. Background
The stage was set for the current strife between Alifax and Alcor during Francesco Frappa's time as a student in Udine, Italy. In 2000, Frappa interned as a trainee at Sire, a local company. (Pl.'s Statement of Undisputed Facts ("PSUF") ¶ 2, ECF No. 165.) After two years, he discussed taking a permanent role with Sire's CEO and was promoted to the position of mechanical fitter apprentice.[1] (Id. ¶¶ 3-4)
*153 Frappa and Sire executed a hiring letter formalizing the apprenticeship in Udine on October 7, 2002.[2] (Id. ¶ 5; see also SUF Ex. A at 2, ECF No. 155-1). The letter states that it was a communication pursuant to cited sections of Italian law and that, "[f]or other provisions not expressly provided for ... see the laws in effect and the National Collective Bargaining Agreement applied to the MECHANICAL ENGINEERING INDUSTRY." (PSUF Ex. A at 2 (emphasis added).) The "[a]pprenticeship length" was three-and-a-half years, and Sire agreed to pay Frappa "per [the] Collective Bargaining Agreement used by the company." (Id. )
Alifax, an Italian corporation headquartered in Padova, Italy, acquired Sire two years later.[3] (SUF ¶ 11; see also Pl.'s Statement of Disputed Facts ("PSDF") ¶ 3, ECF No. 161-1.) Frappa nevertheless became a permanent mechanical fitter for Sire in October 2004. (PSUF ¶ 12.) He was promoted over seven years to different roles with more responsibility. (Id. ¶ 13-14.) His duties included hardware and software development as well as work with Alifax's erythrocyte sedimentation rate ("ESR") analyzers, clinical devices used to test blood samples for indicia of non-specific inflammation. (Id. ¶¶ 20-22.) At least some of his ESR-related duties were supervisory. (Id. ¶¶ 22-23.) Frappa worked exclusively at Sire facilities in Udine and nearby Nimis or at Alifax's Padova headquarters. (Id. ¶ 27.) He answered to supervisors in Italy and collected his pay and benefits in Italy. (Id. ¶¶ 28-29.)
Frappa gave notice of his intent to resign from Sire at the end of August 2011, citing a "change of position" as the motive for his departure. (Id. ¶ 30; PSUF Ex. B at 2.) His notice was effective September 1, 2011, but he explained that he intended "to remain at the company for the entire two-month notice period as set forth in the Contract." (PSUF Ex. B at 2.) Prior to leaving, Frappa forwarded certain information concerning an "anemia factor" and myeloma from his Sire email account to a personal email account. (See PSDF ¶ 106.)
Frappa's resignation followed a week-long trip to Rhode Island as the guest of Alcor's founder, Carlo Ruggieri. (PSUF ¶ 52.) Alcor is a Rhode Island corporation that also produces diagnostic devices. (See Pl.'s Statement of Additional Undisputed Facts ("PSAUF") ¶ 1, ECF No. 173-1.) Ruggieri invited Frappa to Rhode Island based on a lead from an industry professional to assess whether Frappa might leave Alifax and whether they might work together. (See PSUF ¶ 52; PSUF Ex. F at 4.) At the end of Frappa's two-month notice period, Ruggieri told Alcor's staff Frappa would "immediately take over full responsibility for Alcor['s] most advanced diagnostic product development projects" as a vice president of research and development. (SUF ¶ 33; SUF Ex. E at 2.)
Frappa moved to Rhode Island around May 2012 and began working on Alcor's iSED ESR analyzer. (SUF ¶ 33; PSAUF Ex. 1 at ¶ 8, ECF No. 169-6.) The iSED
*154 competes with Alifax's analyzers by delivering blood test results for ESR in just twenty seconds.[4] (See Second Am. & Suppl. Compl. ¶ 8, ECF No. 68; Defs.' Answer to Pl.'s Second Am. & Suppl. Compl. & First Am. Countercl. ¶ 8, ECF No. 71.) Alcor developed the iSED in Rhode Island where it is headquartered. (PSAUF ¶¶ 1, 3.) Frappa remains employed by Alcor, but now resides in Europe. (PSUF ¶ 34; PSDF ¶ 2; Defs.' Answer to Second Am. & Suppl. Compl. ¶ 2). He remains an Italian citizen. (PSUF ¶ 34.)
When Alifax discovered the iSED had rapid analytical capabilities comparable to its devices, it cried foul. It accused Alcor and Frappa of misappropriating its trade secrets and using its proprietary information to develop the iSED, thereby violating the Rhode Island Uniform Trade Secrets Act (Count II) and breaching the confidential relationship between Frappa and Alifax (Count III).[5] (See generally Second Am. & Suppl. Compl.)
II. Legal Standard
A party is entitled to summary judgment if "the record, construed in the light most flattering to the nonmovant, 'presents no genuine issue as to any material fact and reflects the movant's entitlement to judgment as a matter of law.' " Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 20-21 (1st Cir. 2018) (quoting McKenney v. Mangino, 873 F.3d 75, 80 (1st Cir. 2017), cert. denied, --- U.S. ----, 138 S.Ct. 1311, 200 L.Ed.2d 475 (2018) ); see also Fed. R. Civ. P. 56(a).
Alcor argues Alifax's request for a choice-of-law ruling under Rule 56 is improper because it will not determine any disputed claim. This is incorrect. Rule 56(a) expressly authorizes a party to seek partial summary judgment on "part of each claim or defense." Fed. R. Civ. P. 56(a) (emphasis added). The term "judgment" in this context is often a misnomer. See Minority Police Officers Ass'n of South Bend v. City of South Bend, 721 F.2d 197, 200 (7th Cir. 1983). "A partial summary judgment is merely an order deciding one or more issues in advance of trial; it may not be a judgment at all, let alone a final judgment on a separate claim." Id. The 2010 amendments to Rule 56(a) comport with this understanding. See Fed. R. Civ. P. 56, advisory committee notes to 2010 amendments ("The first sentence is added to make clear ... that summary judgment may be requested ... as to a claim, defense, or part of a claim or defense." (emphasis added) ).
An order declaring which law will govern a discrete issue in Count II and all of Count III is a ruling on "part of a claim or defense." Id. It is procedurally consistent with the routine rulings of many courts resolving choice-of-law issues through partial summary judgment. See, e.g., Kase v. Seaview Resort & Spa, 599 F.Supp.2d 547, 549 (D.N.J. 2009) ; Deep Marine Tech., Inc. v. Conmaco/Rector, L.P., 515 F.Supp.2d 760, 768 (S.D. Tex. 2007). Here, the facts bearing on the choice-of-law analysis are undisputed. The issue is therefore ripe for resolution. See Reisch v. McGuigan, 745 F.Supp. 56, 58 (D. Mass. 1990) ("Because there are no material facts in dispute ... the choice of law issue can be decided on defendants' summary judgment motion, as can any questions *155 of [foreign] law presented under Fed. R. Civ. P. 44.1.").
III. Discussion
A federal court sitting in diversity applies the forum state's choice of law rules. See Baker v. St. Paul Travelers Ins. Co., 595 F.3d 391, 392 (1st Cir. 2010) ; Lexington Ins. Co. v. Gen. Accident Ins. Co. of Am., 338 F.3d 42, 46 (1st Cir. 2003). For tort-based claims, Rhode Island follows an interest-weighing approach to determine what jurisdiction "bears the most significant relationship to the events and the parties." Harodite Indus., Inc. v. Warren Elec. Corp., 24 A.3d 514, 534 (R.I. 2011) (emphasis and quotation marks omitted). The Rhode Island Supreme Court has not adopted a definitive analysis for contract-based claims.[6] It has applied both the lex loci contractus doctrine and an interest-weighing test. Compare DeCesare v. Lincoln Benefit Life Co., 852 A.2d 474, 484 (R.I. 2004) (noting that for contract-based claims, "the law of the state where the contract was executed governs"), with Gordon v. Clifford Metal Sales Co., 602 A.2d 535, 539 (R.I. 1992) (applying interest-weighing analysis).
Alifax has made this inquiry trickier by pleading claims that may draw upon the law of up to three different sovereigns. But this challenge is not insurmountable. As the Court has already held, multiple jurisdictions' laws may be applied under the principle of depecage. See Alifax Holding SpA v. Alcor Sci., Inc., No. CA 14-440 S, 2015 WL 5714727, at *2 (D.R.I. Sept. 29, 2015). Depecage permits "different issues in a single case, arising out of a common nucleus of operative facts, [to] be decided according to the substantive law of different states." Id. (citing Putnam Res. v. Pateman, 958 F.2d 448, 464-65 (1st Cir. 1991) ; see also Oyola v. Burgos, 864 A.2d 624, 628 (R.I. 2005) (explaining that conflict-of-laws "questions are issue-specific").
Alifax seeks a choice of law ruling with respect to one element of Count II (breach of a duty of secrecy) and Count III (breach of a confidential relationship). Pursuant to the depecage principle, the Court considers these counts separately, but in reverse order.
A. Count III: Breach of a Confidential Relationship
1. Does Count III Sound in Tort or Contract?
Count III alleges that Frappa breached a fiduciary duty created by the terms of his employment with Sire by disclosing Sire's confidential information to Alcor. (See Second Am. & Suppl. Compl. ¶ 73; see also Pl.'s Mot. for Partial Summ. J. 12 ("Pl.'s Mot."), ECF No. 155.) Alifax argues that because Frappa's duty arose out of his contractual employment with Sire, Count III "sounds in contract" and triggers Rhode Island's related choice-of-law principles, favoring Italy. (Pl.'s Mot. 12-13.) Alcor stresses that Count III does not plead breach of contract; it pleads breach of fiduciary duty, which is a tort. (Defs.' Opp'n to Pl.'s Mot. for Partial Summ. J. ("Defs.' Opp'n") 7, ECF No. 169-2.) Alcor's balancing of jurisdictional interest factors favors Rhode Island.
Alifax's characterization of Count III as contract-based relies foremost on the Rhode Island Supreme Court's holding in Matarese v. Calise, 111 R.I. 551, 305 A.2d 112 (1973). Matarese is a curious case. The *156 plaintiff engaged the defendant, through an oral agreement made in Italy, to secure title to certain property in Italy from its owner in the United States. See Matarese, 305 A.2d at 115. Rather than purchasing the land for plaintiff, defendant bought it for himself, and was found liable for breaching a fiduciary duty to plaintiff. Id. at 116.
The defendant appealed, arguing the trial court erroneously applied Rhode Island law rather than Italian law. The Court disagreed, stating the agreement "created a personal relationship between plaintiff and defendant of principal and agent whereby in return for a valid consideration, defendant would act in a fiduciary capacity to obtain the property in question for plaintiff." Id. at 118. It further ruled that "[t]his agreement and the relationship created by it are governed by the usual rules of contract," and applied the corresponding choice-of-law principles. Id. Because the agreement creating the relationship was made "with a view to performance in [the United States]," id., it fell within an exception to the general rule that "contracts are governed by the laws of the state or country in which they are made ....," id. at n.4 (quotation marks omitted).
Matarese conflicts with the orthodox understanding that a claim for breach of fiduciary duty sounds in tort. See, e.g., Wampanoag Grp., LLC v. Iacoi, 68 A.3d 519, 523 (R.I. 2013) ; Zuba v. Pawtucket Credit Union, 941 A.2d 167, 173 (R.I. 2008) ; see also Restatement (Second) of Torts § 874 (Am. Law Inst. 1979). This dissonance may make for an intriguing academic discussion.[7] The Matarese holding is nevertheless reasonably clear: if a fiduciary duty arises from an express agreement's terms, contract-based rules govern any choice-of-law question. Here, Frappa's duty to Alifax is premised on the terms of an express agreement as construed in light of Italian law: the national collective bargaining agreement for the mechanical engineering industry ("NCBA").[8] Pursuant to Matarese, such a claim sounds in contract, thus the principles for contract-based claims must determine any choice of law.[9]
2. Substantive Choice-of-Law Analysis
Italy is the favored jurisdiction under all applicable tests for a contract-based claim. The Court agrees with Alifax that Frappa's hiring letter convincingly demonstrates the parties' intent to apply Italian law to his employment relationship, even in the absence of an express governing law clause. See Restatement (Second) of Conflict of Laws § 187 cmt. a (Am. Law Inst. 1971).[10] The letter states that it was *157 issued pursuant to identified sections of Italian law and expressly incorporates "the laws in effect" in addition to the NCBA. (PSUF Ex. A at 2.) Frappa admits he "understood that Italian law applied to the contract." (Frappa Decl. ¶ 4, ECF No. 169-6.) Thus, the Court must respect the parties' choice of Italian law. See DeFontes v. Dell, Inc., 984 A.2d 1061, 1067 (R.I. 2009) (following Restatement (Second) of Conflict of Laws § 187 (Am. Law Inst. 1971) ). But if the parties' choice was not enough, they executed Frappa's hiring letter and formed the employment relationship under the NCBA in Italy.[11] The lex loci contractus doctrine therefore would require the Court to apply Italian law. See, e.g., DeCesare, 852 A.2d at 484 ; Union Sav. Bank v. DeMarco, 105 R.I. 592, 254 A.2d 81, 83 (1969).
An interest-weighing analysis yields the same result. See Gordon v. Clifford Metal Sales Co., 602 A.2d 535, 538 (R.I. 1992) (considering Restatement factors); see also Restatement (Second) of Conflict of Laws §§ 6, 188 (Am. Law Inst. 1971). The relevant factors include:
(a) the place of contracting,
(b) the place of negotiation,
(c) the place of performance,
(d) where the contract's subject matter is located, and
(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.
See Restatement (Second) of Conflict of Laws § 188 (Am. Law Inst. 1971). The Court may also consider policy factors such as:
(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability and uniformity of result, and
(g) ease in the determination and application of the law to be applied.
Id. § 6 ; see also Gordon, 602 A.2d at 538.
Here, Frappa's employment relationship with Sire was negotiated, consummated, performed, and terminated entirely in Italy. Frappa claims he was domiciled in Rhode Island at the time of any alleged breach. (See Defs.' Resp. to PSUF ¶ 34, ECF No. 169-3.) But he remains an Italian citizen, and if the place of negotiation and the place of performance are the same, the law of that jurisdiction presumptively applies. See Restatement (Second) of Conflict of Laws § 188(3) (Am. Law Inst. 1971). Applying Rhode Island law arguably would be easier, however doing so would upset the "justified expectations" of the parties and inject unpredictability into a defined relationship. See id. § 6(d)-(e), (g). It is also hard to fathom what interest Rhode Island could have in regulating an Italian company's relationship with its Italian ex-employee. Id. § 6(c).
As a practical matter, the same outcome would result from Rhode Island's *158 interest-weighing analysis for tort-based claims. See Harodite Indus., 24 A.3d at 534 (listing Restatement factors).[12] The conduct causing the alleged breach - the Defendants' alleged misappropriation of Alifax's trade secrets - occurred in Rhode Island. See Magnum Def., Inc. v. Harbour Grp. Ltd., 248 F.Supp.2d 64, 69 (D.R.I. 2003) (finding that misappropriation takes place where the defendants' misused confidential information). But the place of injury was Italy. See Restatement (Second) of Conflict of Laws § 145 cmt. f (Am. Law Inst. 1971). Furthermore, while the various domiciles, residences, places of business and incorporation of the parties weigh equally, Italy is plainly the center of the relationship. Frappa worked in that country for Sire, and later its parent Alifax, for more a decade. All material aspects of his employment - including his acquisition of the alleged trade secrets or confidential information - occurred in Italy.
Tort-related policy considerations do not change the outcome.[13] Applying Rhode Island law would be simpler, but less foreseeable. The Court also does not believe that Rhode Island clearly follows a "better rule." See Harodite Indus., 24 A.3d at 526. And Italian law does not, as Alcor argues, infringe on important Rhode Island policy prerogatives by altering a Rhode Island employee's fiduciary duties. (See Defs.' Opp'n 9.) When the alleged duty arose, Frappa was employed in Italy, not Rhode Island. Finally, it should not come as a great surprise to Frappa or Alcor that the confidentiality obligations of an Italian competitor's ex-employee arising from the former employment relationship performed exclusively in Italy would be interpreted under Italian law.
Based on the foregoing analysis, the Court finds that Italian law will govern Count III.
B. Count II: Trade Secret Misappropriation
1. Can Italian Law Govern Frappa's Duty of Secrecy?
In Count II, Alifax alleges that Alcor and Frappa violated the Rhode Island Uniform Trade Secrets Act ("RIUTSA"), R.I. Gen. Laws § 6-41-1 et seq., by misappropriating its trade secrets. Misappropriation is defined to include the acquisition of a trade secret "by a person who knows or has reason to know that the trade secret was acquired by improper means." Id. § 6-41-1(2)(i). "Improper means" include a "breach or inducement of a breach of a duty to maintain secrecy." Id. at § 6-41-1(1). RIUTSA also prohibits disclosure or use of another's trade secret without consent by a person who (1) used "improper means" to acquire it, or (2) "knew or had reason to know" that the trade secret was "[d]erived from or through a person who owed a duty to the person seeking relief to maintain its secrecy." Id. § 6-41-1(2)(ii)(B). The statute does not enumerate the possible sources of a defendant's "duty to maintain secrecy."
Alifax theorizes that Frappa's duty for RIUTSA purposes arose from his employment *159 relationship with the company. (See Pl.'s Reply in Supp. of Its Mot. for Partial Summ. J. ("Pl.'s Reply") 3-4, ECF No. 173.) Thus, Alifax contends that the Italian law bearing on Count III would also serve to define the substance of this single element of its RIUTSA claim.
The Defendants dismiss out of hand the idea that Italian law could supply such a duty here. Instead, they argue that where Alifax has sued a Rhode Island corporation under a Rhode Island statute, Rhode Island law must define any duty of secrecy. This interpretation, however logical, conflicts with RIUTSA's plain language. The statute's text is broad; it does not impose limits on the source of the duty of secrecy. For example, a duty may arise from an express contract. See, e.g., Roton Barrier, Inc. v. Stanley Works, 79 F.3d 1112, 1118 (Fed. Cir. 1996) (holding confidentiality agreement created a duty to maintain secrecy under Illinois Trade Secret Act). Or a duty may be implied by law based on the parties' relationship. See Kamin v. Kuhnau, 232 Or. 139, 374 P.2d 912, 919 (1962) (holding confidentiality agreement could be implied in fact); Aerospace Am., Inc. v. Abatement Techs., Inc., 738 F.Supp. 1061, 1071 (E.D. Mich. 1990) (holding confidential relationship may give rise to " 'confidential' or 'fiduciary' duty by operation of law" in trade secret misappropriation action). And finally, a duty may be established by statute or by common law. See Union Pac. R.R. Co. v. Mower, 219 F.3d 1069, 1073-76 (9th Cir. 2000) (holding state statute imposing duty of confidentiality could have been source of defendant's obligation to his former employer); Gen. Reinsurance Corp. v. Arch Capital Grp., Ltd., No. X05CV074011668S, 2007 WL 3121766, at *11, 2007 Conn. Super. LEXIS 2629 at *27 (Conn. Super. Ct. Oct. 17, 2007) (finding Connecticut law imputes a duty to refrain from disclosing trade secret information even in the absence of a specific agreement).
It indeed would be odd for the law of Rhode Island - a jurisdiction neither Alifax nor Frappa had any connection to before August 2011 - to define a duty arising during Frappa's employment in Italy. Alcor cites no authority holding that the law of another jurisdiction, if applicable, cannot be the source of a defendant's confidentiality obligations under RIUTSA. And while Alifax's citations are also thin, the Court finds no persuasive justification for Alcor's narrower interpretation. Such an outcome would be inconsistent with RIUTSA's liberal terms, the diverse sources of parties' duties of secrecy reflected in case law, and one of the broad motivating policies of trade secret law: "the maintenance of standards of commercial ethics." See Uniform Trade Secrets Act § 1 cmt. (1985) (quoting Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) ).
Neither party has provided a true choice-of-law analysis regarding the "breach of duty" element of Count II. It is clear, however, the "circumstances giving rise to a duty to maintain [the] secrecy," R.I. Gen. Laws § 6-41-1(2)(ii)(B)(III), of Alifax's confidential information would be the same circumstances creating a duty under Count III, i.e., Frappa's employment relationship with Sire. Count III and the "duty" element of Count II thus should rise or fall together. And as explained at length above, under the circumstances of this case, Frappa's duty of confidentiality to Alifax is governed by the law of Italy.
2. The "Reasonableness" of Alifax's Conduct
Alifax has also asked the Court to find that Italian law shall govern whether Alifax's efforts to maintain the secrecy of its trade secret information were "reasonable under the circumstances."
*160 R.I. Gen. Laws § 6-41-1(4). The Court declines to do so. As Alcor argues, whether Alifax's conduct was reasonable is fundamentally a question of fact. See, e.g., Spottiswoode v. Levine, 730 A.2d 166, 175 n.7 (Me. 1999) (listing facts bearing on reasonableness of efforts to maintain secrecy); Furmanite Am., Inc. v. T.D. Williamson, Inc., 506 F.Supp.2d 1134, 1141 (M.D. Fla. 2007) (stating whether a party took reasonable steps to protect trade secrets is a "fact-intensive" question). There is no choice of law to be made regarding this issue.
C. The Applicable Law of Italy
Having resolved the choice-of-law question, the Court now must construe the baroque mosaic of Italian law, the substance of which is disputed. The Court is not obliged to make such a determination at this stage. Nevertheless, the Court believes this is a suitable point to provide the parties with guidance concerning the substance of the law that will apply at trial.[14]
A ruling on the substance of foreign jurisprudence is treated as a question of law. See Fed. R. Civ. P. 44.1. Native practitioners have commented that Italian employment law "could be defined as an unicum in the European panorama, consisting of an exceptional complexity of laws different from any other ..." Carrado Cardarello and Marco Musella, Employment Law Practices and Trends in Italy, in Employment Law Client Strategies in Europe, 2010 WL 4735528, at *1 (2011). The Court has thus drawn on a multitude of materials from the best available sources to aid its analysis. See Bodum USA v. La Cafetiere, Inc., 621 F.3d 624, 628 (7th Cir. 2010).
Included among these materials were the declarations of the parties' experts, who reach differing conclusions about the obligations imposed under Italian law. (See generally Toffoletto Decl., ECF No. 157; Lanzavecchia Decl., ECF No. 169-7; Toffoletto Rebuttal Decl., ECF No. 189-1.) But as the Ninth Circuit has emphasized, expert testimony about foreign laws "is not an invariable necessity" and "judges may reject even the uncontradicted conclusions of an expert witness and reach their own decisions ...." Pazcoguin v. Radcliffe, 292 F.3d 1209, 1216 (9th Cir. 2002), as amended on denial of reh'g and reh'g en banc, 308 F.3d 934 (9th Cir. 2002) (quotation marks omitted). Foreign law experts' opinions are thus entitled to whatever weight the Court finds they deserve. See, e.g., Fahmy v. Jay-Z, 788 F.Supp.2d 1072, 1076 (C.D. Cal. 2011).
While helpful, neither parties' expert provided a comprehensive explanation of the Italian legal framework or the propositions of law disputed here. The Court consequently has conducted independent research to address unanswered questions, refine its understanding of the disputed principles, and evaluate the soundness of the proffered opinions. See Bodum USA, 621 F.3d at 628 ; Carey v. Bahama Cruise Lines, 864 F.2d 201, 205 (1st Cir. 1988) (" Federal Rule of Civil Procedure 44.1 empowers a federal court to determine foreign law on its own ..."). The Court's determination is thus informed by a wide array of sources.
1. The Italian Civil Law System
First things first: Italy is a civil-law nation. Unlike a common law system, "the responsibility for establishing the framework of the legal order rests solely with legislative, executive and administrative *161 authorities .... Legal rules or doctrines are not formulated by the courts, and judicial decisions do not create rules of law." Manos v. Trans World Airlines, Inc., 324 F.Supp. 470, 485 (N.D. Ill. 1971). There is no "formal rule of precedent," hence decisional law is of secondary importance. Creazioni Artistiche Musicali, S.r.l. v. Carlin Am., Inc., 2016 WL 7507757 at *9 (S.D.N.Y. Dec. 30, 2016) (quoting Douglas L. Parker, Standing to Litigate "Abstract Social Interests" in the United States and Italy: Reexamining "Injury in Fact," 33 Colum. J. Transnat'l L. 259, 275 (1995) ); see also King v. Cessna Aircraft Co., No. 03-20482-CIV, 2010 WL 5253526, at *10 (S.D. Fla. Sept. 13, 2010), R & R adopted in part, No. 0320482-CIV, 2010 WL 5173152 (S.D. Fla. Dec. 14, 2010) ; Manos, 324 F.Supp. at 485. The rulings and commentaries of Italian authorities may nonetheless carry persuasive weight, particularly if primary sources of law are silent. See Carlin Am., Inc., 2016 WL 7507757 at *9 ; King, 2010 WL 5253526 at *10 ; Manos, 324 F.Supp. at 485 ; see also John Henry Merryman, The Italian Style III: Interpretation, 18 Stan. L. Rev. 583, 608 (1966) (finding value of judicial interpretation increasingly recognized).
Within this framework, the Court agrees with the parties' experts that there are three sources that inform Frappa's alleged duty of confidentiality to Alifax: (1) Civil Code Article 2105; (2) the NCBA; and (3) Civil Code Article 2598.
a. Article 2105
Entitled "Duty of Loyalty," Article 2105 states:
An employee cannot engage in business, either for his own account or for the account of third parties, in competition with his employer, nor divulge information pertaining to the organization or the methods of production of the enterprise, nor use it in a manner which may be prejudicial to the enterprise.
C.c. 2105. It is undisputed that these loyalty obligations are enforceable during the employment relationship. See Toffoletto Decl. ¶ 11; Lanzavecchia Decl. ¶¶ 9-10; see also Emanuele Menegatti, The Choice of Law in Employment Contracts' Covenants Not to Compete Under the Italian Legislation, 31 Comp. Lab. L. & Pol'y J. 799, 802 n.12 (2010). Authorities are divided, however, over whether Article 2105's duty of non-disclosure applies postemployment. See Toffoletto Rebuttal Decl. ¶ 8; Lanzavecchia Decl. ¶¶ 12-14; see also Mario Franzosi, Italy: Employer-Employee Relations, in 2 Trade Secrets Throughout the World § 22:11 (2018) ("Some writers believe that the duty of good faith ... continues beyond the employment term."); Marco Biagi, Employee Loyalty in Italian Labor Law, 20 Comp. Lab. L. & Pol'y J. 249, 254 n.21 (1999) ("[S]ome interpreters agree that unless a special agreement is concluded ... the sect. 2105 provisions are not in effect after the termination of the working relationship.").
The Court is persuaded that Article 2105's duty of non-disclosure is extinguished at the end of employment. See Manos, 324 F.Supp. at 485-89 (resolving unsettled question of Italian law to determine liability). The Court's construction is guided by Civil Code Article 12.[15] First, *162 Article 2105's text plainly states that its conditions are those of "[a]n employee." C.c. 2105. This limitation is consistent with Article 2125, whereby "any agreement which intends to restrict the activities of an employee during the time subsequent to the termination of the employment contract is void" unless specific limits on time, place, scope and compensation are satisfied. C.c. 2125. It is also consistent with at least three rulings from Italy's Supreme Court. See Franzosi, supra, at 2 (citing Cass., sez. lav., 13 novembre 1972, n. 1156, Giur. it. 1976); Biagi, supra, at 251-52 (citing Cass., sez. lav., 3 febbraio 1986, Giur. it. 1986, 478); Lanzavecchia Decl. ¶ 13 (citing Cass., sez. lav., 6 marzo 1985, n. 3301, Giur. it. 1986, 23). The weight of other persuasive authority favors limiting Article 2105 to the duration of employment as well. See Lanzavecchia Decl. ¶ 12 (citing commentaries); Biagi, supra, at 254 n.21 (citing cases holding Article 2105's provisions ineffective after termination).
The Court therefore finds that Article 2105 does not impose any post-employment duty on Frappa concerning his use or disclosure of Alifax's confidential information.
b. The NCBA
The NCBA for the mechanical engineering industry is the focal point of Alifax's arguments. The agreement is incorporated by reference in Frappa's 2002 hiring letter. (PSUF Ex. A at 2.) The relevant section of the agreement states that employees
must maintain absolute secrecy regarding the interest of the company; furthermore, they shall not profit, to the detriment of the employer, from what is the object of their duties in the company ... nor abuse, after terminating the employment relationship and as a form of unfair competition, information obtained during their period of employment.
(PSUF Ex. D at 5, ECF. No. 155-4, (emphasis added).) The parties disagree whether the hiring letter "applied beyond its express terms" or whether Frappa understood so-called "standard terms" applied to his position.[16] (See, e.g., Defs.' Resp. to PSUF ¶ 15.)
Whether the NCBA governed Frappa's employment is of course not a question of fact, but of law.[17] In Italy, collective bargaining agreements are the "principal instrument for determining the terms and conditions of employment." Piergiovanni Mandruzzato & Sara Bittolo, Italy, in 1A International Labor and Employment Laws 6-73 (4th ed. 2014). Depending on the industry, collective agreements may exist at the national, regional, and company levels. Id. at 6-69. National collective bargaining agreements are negotiated between industry-wide labor unions and employer associations. Id. at 6-70.
Italian courts have extended collective agreements to cover all workers of any employer-member of a signatory industry association. Id. at 6-73 (citing Cass., 1 Sept. 1995, No. 9231). A non-member employer may nevertheless be bound to a collective agreement if the employer applies the agreement by its own initiative or incorporates it into an individual contract *163 at the time of hire. Id. at 6-74 (citing Cass., 17 luglio 1987, n. 6306; 5 marzo 1992, no. 2664; Cass., 17 novembre 1990, no. 10581). As at least one authority has concluded, it is "quite difficult" for a business "to avoid applying the terms and conditions of collective agreements concluded on a national and regional level ...." Id. at 6-75.
There is no record evidence concerning whether Sire or Alifax was a member of an employer association that signed the NCBA. But the declaration of Alcor's expert implies that was the case, which accords with the unrebutted assertion of Giovanni Duic, Sire's managing director, that the NCBA was "applicable to Sire's industry." (Duic Aff. ¶ 7, ECF No. 165.) Regardless, the NCBA was incorporated into Frappa's initial hiring letter. An Italian Court would therefore likely conclude that Sire and Frappa adopted the agreement's provisions by their own initiative. See Mandruzzato & Bittolo, supra, at 6-74.
What remains is how to interpret the emphasized language above. Here, the Court's interpretation is guided by Italy's codified rules for construing contracts. See Pignoloni v. Gallagher, No. 12-CV-3305 (KAM)(MDG), 2012 WL 5904440, at *23-24 (E.D.N.Y. Nov. 25, 2012), aff'd, 555 F. App'x 112 (2d Cir. 2014) (listing cannons of construction under the Italian Civil Code); Filipp Andrea Chiaves, An Introduction to the Law of Contracts in Italy, 1 Global Jurist Topics [i], 8 (2001). These rules apply equally to collective agreements. See Mariella Magnani, The Role of Collective Bargaining in Italian Labor Law, 7 E-Journal of Int'l and Comp. Lab. Studies 8 (2008).
Alifax asserts that the NCBA imposes a duty on a former employee to keep confidential "essentially all information" about an ex-employer's business learned during employment. (Pl.'s Mot. 11.) Although its expert does not articulate the contours of a specific interpretation, he urges the Court to use a "common sense" construction of "unfair competition" rather than a "technical legal definition" such as that provided by Article 2598.[18] (Toffoletto Rebuttal Decl. ¶¶ 2-3.)
Such an interpretation is boundless. It suggests an Italian court would enforce a duty of secrecy on an ex-employee that is indefinite both in scope and duration. This is incompatible with the Italian Supreme Court's holdings that technical know-how acquired while working for an ex-employer may be used in future employment. See Franzosi, supra, at 2-4. It would also be contrary to Article 1366, which requires every contract to be interpreted "in good faith." The proposed construction would place a more stringent burden on former employees than current employees. See C.c. 2105.
The Court finds that a narrower reading is more likely consistent with the subjective intent of the parties. See C.c. 1362; Chiaves, supra, at 8. Alcor's expert directs the Court to Article 2598, which provides a codified definition of unfair competition:
Subject to the provisions concerning the protection of distinctive signs and patent rights, acts of unfair competition are performed by whoever: ... (3) avails himself directly or indirectly of any other means which do not conform with the principles of correct behavior in the trade and are likely to injure another's business.
C.c. 2598. It is widely agreed that this provision prohibits ex-employees from using an employer's confidential information in subsequent employment. See Franzosi, *164 supra, at 2-3 (and cases cited therein); see also Toffoletto Rebuttal Decl. § 12; Lanzavecchia Decl. ¶ 16. As stated by the Italian Supreme Court:
The use by an ex-employee, in later employment, of processes which are confidential and owned by his ex-employer (and known by the ex-employee because of his previous experience and because of his position as an ex-employee) constitutes activity which is not professionally correct behavior.
Franzosi, supra, at 2. Article 2598 does not prohibit an ex-employee from using experience or technical know-how developed on the job in future positions. See Franzosi, supra, at 2-4 (citing, e.g., Cass., sez. lav., 13 novembre 1972, n. 1156, Guir it. 1976; Corte di Appello, 27 maggio 1977; Corte di Appello, 24 gennaio 1973).
The Court agrees with Alifax's expert that the NCBA does not expressly refer to Article 2598 and that some degree of redundancy may be injected into the agreement by interpreting "unfair competition" in accord with that provision. It is not, however, "senseless." (Toffoletto Rebuttal Decl. ¶ 3.) Article 2598 applies only to "entrepreneurs" who are competitors. See, e.g., Mario Franzosi, Italy: Overview, in 2 Trade Secrets Throughout the World § 22:2; Paulo Auteri, Brief Report on Italian Unfair Competition Law, in Law Against Unfair Competition: Towards a New Paradigm In Europe? 152 (2007) ("According to the prevailing opinion, unfair competition law only applies to competitive activities that are committed by one entrepreneur to harm another competitor."); (Toffoletto Decl. ¶ 18). Thus, by definition, Article 2598's ban on unfair competition can only apply post-employment. The NCBA creates a similar duty that only arises "after terminating the employment relationship" (PSUF Ex. D at 5, (emphasis added) ).[19] There is no incongruity.
Civil Code Article 1371 provides additional guidance. If other criteria have failed to establish a satisfactory meaning, Article 1371 instructs that an agreement should be construed to balance the parties' opposing interests. C.c. 1371. Taken together, Article 2598, Article 2105, and the rulings of the Italian Supreme Court demonstrate an unmistakable desire to safeguard the confidential and proprietary information of employers from unfair exploitation.[20] The Court accordingly finds that Frappa owes Alifax, which now stands in Sire's shoes, a post-employment duty of loyalty prohibiting the disclosure or use of Alifax's confidential or proprietary information in a manner that was likely to injury Alifax's business. This duty does not encompass Frappa's professional skills or technical know-how, even if acquired or improved during his work for Sire.[21]
D. Postscript On Rhode Island Law
As explained above, based on the fundamentally contractual nature of Frappa's duty, the Court believes it is obliged to *165 apply Italian law. See DeCesare, 852 A.2d at 481 ; Matarese, 305 A.2d at 118 n.4 ; see also Restatement (Second) of Conflict of Laws § 188 (Am. Law Inst. 1971) ; 15A Corpus Juris Secundum Contracts § 13. A short codicil on Rhode Island law is nevertheless warranted to demonstrate that, but for these rules, applying local law would not result in a substantially different outcome.[22]
The Rhode Island Supreme Court has long held that employees owe their employers a fiduciary duty of loyalty during their employment. See Rego Displays, Inc. v. Fournier, 119 R.I. 469, 379 A.2d 1098, 1101 (1977). This duty prohibits employees from competing with their employer by soliciting customers for personal gain. See id.; see also Baris v. Steinlage, No. C.A. 99-1302, 2003 WL 23195568, at *22 (R.I. Super. Ct. Dec. 12, 2003). It also bars an employee privy to secret or proprietary information from abusing his employer's trust by breaching such confidences. See Rego Displays, 379 A.2d at 1101 ; Abbey Med./Abbey Rents, Inc. v. Mignacca, 471 A.2d 189, 193 (R.I. 1984).
When the employment relationship ends, the employee's "right to entrepreneurial freedom" is restored. Rego Displays, 379 A.2d at 1100. This right is not, however, absolute. Rhode Island will enforce reasonable non-competition agreements. See, e.g., Durapin, Inc. v. Am. Prods., Inc., 559 A.2d 1051, 1053 (R.I. 1989). Even absent an express agreement, a former employee has a duty as a matter of law not to use or disclose confidential information acquired by virtue of occupying a position of confidence with a former employer. See Long v. Atl. PBS, Inc., 681 A.2d 249, 254 n.7 (R.I. 1996) (citing, e.g., Comedy Cottage, Inc. v. Berk, 495 N.E. 2d 1006, 1011 (Ill. App. Ct. 1986) ); J.B. Prata, Ltd. v. Bichay, 468 A.2d 266, 268 (R.I. 1983) ; Callahan v. R.I. Oil. Co., 103 R.I. 656, 240 A.2d 411, 413 (1968) ("[A]n employer is entitled to equitable protection against the competitive use of confidential and secret information obtained as a result of the trust and confidence of previous employment ..." (quoting Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy, 415 Pa. 276, 203 A.2d 469, 471 (Pa. 1964) ).
The Rhode Island Supreme Court's ruling in J.B. Prata is illustrative, if brief. The plaintiff in that action sought an injunction prohibiting its former employees from soliciting its customers. J.B. Prata, 468 A.2d at 267. Neither defendant had an employment contract or non-competition agreement. Id. The Court nevertheless affirmed the order enjoining solicitation, holding:
[P]laintiff established that defendants were employed by plaintiff, acquired certain information while so employed, and then left plaintiff to work for a competitor. In addition, the trial court specifically found that the information defendants acquired was acquired as a direct result of the confidential relationship that existed between plaintiff and both defendants.... If unrebutted, this evidence would satisfy the burden of proof required for having a permanent injunction imposed.
Id. at 268 ; see also Dryvit Systems, Inc. v. Healy, No. C.A. KC 89-45, 1989 WL 1110572, *6 (R.I. Super. Ct. Apr. 26, 1989) (declining to enforce non-compete but issuing TRO as the court "recognize[ d] a legitimate interest in the [employer] not to *166 have confidential information and trade secrets exploited by the [ex-employee].")
Rhode Island's implied post-departure duty is not all-encompassing. See Colonial Laundries v. Henry, 48 R.I. 332, 138 A. 47, 48 (1927) ("[A]ll knowledge acquired by the employee is not of a confidential nature."). Moreover, the case law shows that such a duty only arises in limited circumstances: the employment relationship must be one of "trust and confidence." Callahan, 240 A.2d at 413 ; see, e.g., Long, 681 A.2d at 254 n.7 (affirming judgment in part as defendant did not, among other things, breach "fiduciary confidences" gained from former position through post-departure solicitation); J.B. Prata, 468 A.2d at 267 ; Colonial Laundries, 138 A. at 48. Although the contours of Rhode Island's implied duty differ slightly in form, its scope is fundamentally congruent with the duty under Italian law arising from Frappa's employment relationship.
IV. Conclusion
For the foregoing reasons, Alifax's Motion for Partial Summary Judgment on Counts II and III of the Second Amended Complaint (ECF No. 154) is GRANTED. The substantive law of Italy shall be applied to the "breach of a duty to maintain secrecy" element of Count II and all of Count III, and that law shall be interpreted as set forth above.
IT IS SO ORDERED.

Defendants respond to various contentions by stating "disputed but irrelevant," without specifically citing contrary record evidence. Such responses do not create a genuine dispute of fact. See LR Cv 56(a)(3); Ruiz Rivera v. Riley, 209 F.3d 24, 28 (1st Cir. 2000) ("[F]ailure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted and ruling accordingly.").

The parties have provided undisputed translations, in whole or part, of all Italian-language documents.

Sire merged completely into Alifax during this litigation. (See PSDF ¶ 3.)

The traditional Westergren method of calculating ESR requires testing times of one to two hours to obtain suitable results. (PSDF ¶ 17.)

Alifax also claims patent and copyright infringement. (See generally Second Am. & Suppl. Compl.)

The First Circuit has remarked that, under Rhode Island law, the "proper choice-of-law test for contract cases [is] shrouded in uncertainty." Crellin Techs., Inc. v. Equipmentlease Corp., 18 F.3d 1, 5 (1st Cir. 1994) (reviewing various tests applied by the Rhode Island Supreme Court).

Italian law is a particularly bad fit for a bifurcated choice-of-law model. Italian employment relationships are fundamentally contractual, but agreements are minimalist in form and rely heavily on duties established as a matter of law or in ancillary collective agreements. See, e.g., Piergiovanni Mandruzzato & Sara Bittolo, Italy, in 1A International Labor and Employment Laws 6-1, 6-15 (4th ed. 2014).

There is no dispute that an Italian contract must be construed under Italian law. (See Defs.' Opp'n 7.)

This finding does not conflict with the ruling on Alcor's Motion to Dismiss, which suggested the interest-weighing factors for torts would apply. Although the factors were discussed, this issue was not before the Court. Moreover, the Court specifically declined to provide a choice of law ruling on the underdeveloped record. See Alifax, 2015 WL 5714727, at *2.

Comment (a) instructs that "even when the contract does not refer to any state, the forum may nevertheless be able to conclude from its provisions that the parties did wish to have the law of a particular state applied. So the fact that the contract contains legal expressions, or makes reference to legal doctrines, that are peculiar to the local law of a particular state may provide persuasive evidence that the parties wished to have this law applied."

As explained infra, the Court finds that an Italian court would likely apply the terms of the NCBA to Frappa's employment with Sire beyond the express period of his apprenticeship.

Such factors include: "(1) The place where the injury occurred, (2) the place where the conduct causing the injury occurred, * * * (3) the domicile, residence, nationality, place of corporation and place of business of the parties, and (4) the place where the relationship, if any, between the parties is centered." Id. at 526 (quotation marks omitted).

As with analysis for contract-based claims, relevant considerations include "(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interests; and (5) application of the better rule of law." Harodite Indus., 24 A.3d at 526 (quotation marks omitted).

The Court's interpretation of Italian law as stated in this ruling is firm; the parties should treat it as such. Nevertheless, given the manifest complexity of this task, the Court reserves the right to depart from its present interpretation (with notice to the parties) if, by the time of trial, it believes there is a sound basis to do so.

Article 12, "Interpretation of statutes," instructs:
In applying statutes no other meaning can be attributed to them than that made clear by the actual significance of the words, according to the connection between them, and by the legislative intent. If a controversy cannot be decided by a precise provision, consideration is given to provisions that regulate similar cases or analogous matters; if the case still remains in doubt, it is decided according to the general principles of the legal order of the State.
C.c. 12, in 1 Italian Civil Code and Complementary Legislation, ch. II, art. 12 (Susanna Beltramo, trans. 2012).

Mr. Toffoletto's declaration refers to an alleged June 1, 2004, employment contract between Alifax and Frappa. (See Toffoletto Decl. ¶ 20.) No such contract appears in the record before the Court, nor is it referenced in the parties' motion papers. The Court's analysis is not premised on the existence or applicability of such a document.

Neither parties' expert offered significant guidance concerning this preliminary issue.

Neither Alifax nor Alcor have cited any authority interpreting the phrase "unfair competition" as used in the NCBA or in any other analogous agreement.

It is self-evident that Article 2105, despite its limited applicability, also demonstrates an overarching concern with the disclosure of an employer's proprietary information.

The sections of the Italian Penal Code punishing the disclosure of secret information cited by Mr. Toffoletto do not provide useful guidance for interpreting the civil code provisions at issue here. Similarly, Article 2043 of the Civil Code creates a cause of action analogous to a tort, but does not appear to be a source of Frappa's duty of loyalty.

Although the analysis of Alcor's expert seems to suggest otherwise, Alifax does not appear to contend that Article 2598, in and of itself, can be a source of Frappa's duty of confidentiality.

Alcor argues that the Court should bypass the choice-of-law issue based on its narrower interpretation of Italian law. (See Defs.' Opp'n 10-11.) Both parties, however, neglect explain the nature and scope of an ex-employee's duty of confidentiality to a former employer under Rhode Island law.